IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHELBOURNE NORTH WATER STREET CORPORATION, f/k/a SHELBOURNE NORTH WATER STREET, L.P., | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| NATIONAL ASSET MANAGEMENT AGENCY and NATIONAL ASSET LOAN MANAGEMENT, Statutory Bodies of the Republic of Ireland, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**VERIFIED COMPLAINT, JURY DEMAND AND NOTICE OF RELIANCE
ON FOREIGN LAW**

Plaintiff Shelbourne North Water Street Corporation, f/k/a Shelbourne North Water Street, L.P., by its attorneys J. Joseph Bainton and Katherine B. Felice of Barclay Damon LLP and Michael J. Kelly and Adam C. Toosley of Freeborn & Peters LLP, for its Verified Complaint against Defendants National Asset Management Agency and National Asset Loan Management, Statutory Bodies of the Republic of Ireland, respectfully states:

**Nature of the Action**

1.     This action arises from Defendants' willful and malicious conduct that frustrated completion of the iconic Chicago Spire Development Project on Lakeshore Drive that would have brought world-wide acclaim to the City of Chicago for this engineering marvel designed by the world famous architect Santiago Calatrava; damaged Plaintiff in the sum of $1.21 Billion representing the loss of some $525 Million in cash and equity invested in the Project and another $685 Million profit it would have earned had the Project been completed as it should have been;

and misled the Special Liquidators of the Irish Bank Resolution Corporation to accept some $57 Million less than they could have received in satisfaction of loans related to the Spire Project thus cheating the Irish tax payers out of that $57 Million out of sheer spite that certain of NAMA's principals felt toward Garrett Kelleher for repeatedly demonstrating their incompetence and proving in the Irish High Court the blatant efforts of Defendants and their principals to mislead that Court in order to harm unjustly another company owned by Mr. Kelleher.

2.      This action arises under the Diversity Jurisdiction of this Court and asserts claims for (a) breach of contract; (b) tortious interference with contract; (c) tortious interference with prospective economic advantage; (d) breach of both statutory and common law duties to preserve the confidential information of Plaintiff; and (e) negligent spoliation of evidence.

3.      This Court has jurisdiction over the subject matter of this action based upon the complete diversity of citizenship between Plaintiff and Defendants pursuant to 28 U.S.C. § 1332 and that the matters in controversy exceed $75,000 exclusive of interest and costs.

4.      Venue is proper in this District because (a) it is the principal place of business of Plaintiff; (b) most of the conduct from which the claims asserted herein arise occurred within this District; and (c) most of the non-party prescient witnesses whose attendance at trial cannot be obtained other than by subpoena reside within the subpoena power of this Court.

**The Parties and Related Persons**

**Shelbourne, Its Principal, Affiliates and Lender**

5.      Plaintiff Shelbourne North Water Street Corporation, f/k/a Shelbourne North Water Street, L.P. ("Shelbourne") is a corporation organized under the laws of Delaware that maintains its principal place of business within this District.

2

6.     At all relevant times Shelbourne was owned entirely by Milltown, LLC ("Milltown").  Milltown is a limited liability company organized under the laws of the State of Illinois that maintains its principal place of business within this District.

7.     At all relevant times Milltown was owned entirely by Garrett Kelleher ("Kelleher").

8.     Kelleher was born in and is a citizen of the Republic of Ireland ("Ireland").

9.     At all relevant times Kelleher was a well-known international real estate developer, who owned all or substantial interests either directly or indirectly in juridical entities organized under the laws of various jurisdictions around the world, whose businesses were the acquisition and development of various real estate projects.

10.     The majority of these businesses had "Shelbourne" as part of their name.

11.     As more fully explained below, the "business" of the Kelleher juridical entity defined above as Shelbourne was the development of a project known to many Chicagoans and many others around the world as the "Chicago Spire."

12.     For many years prior to the World Financial Crisis of 2008, Anglo Irish Bank Corporation ("Anglo") had provided real estate acquisition and development financing to many of the Kelleher owned companies, including Selbourne.

13.     Kelleher and one of his companies first borrowed a sum less than $10 Million from Anglo in 1997.

14.      That loan was then recommended to Anglo's credit by Tony Campbell and Declan Quilligan, who were Kelleher's relationship managers at the time.

15.      9 years later Tony Campbell had risen to be CEO of Anglo-US and Declan Quilligan had risen to become CEO of Anglo-UK, two successful arms of the Anglo Group.

3

16.     They, together with David Drumm, the CEO of Anglo Group, approved the Spire Loan facility from which this action arises.

17.     Anglo's typical real estate acquisition and development financing was provided in the form of a "Facility Agreement" that contemplated borrowings in increasing amounts on the assumption that the real estate development project that was the subject of the facility proceeded generally as planned.

18.     As a general practice, Anglo asked for developers such as Kelleher to guarantee personally such facilities "regardless of the loan to value ratio" so that Anglo could know that it "could rely on the borrower to use all of their experience, skill, relationships and resources to ensure that the Bank's interests were protected and secure at all times."

19.     This practice by Anglo is confirmed in a letter dated 5 August 2014 to Kelleher from Joe McWilliams, Anglo's Director of Lending between 2006 and 2009 of which a copy is attached as Plaintiff's Exhibit.[1]

20.     Over the years a general course of conduct in respect of such project financing evolved between and among Kelleher, Kelleher's companies and Anglo as well as between the Kelleher Group and other equally well-respected real estate development lenders.

21.     With the exception of NAMA (as defined below), Kelleher was able to maintain over 20 years of good banking relations both before and throughout the World Financial Crisis with all of his companies' other long term lenders as is confirmed by PX-2, which consists of letters from the Bank of Ireland, the Irish subsidiary of Royal Bank of Scotland, Ulster Bank Ireland Limited and Investec, all dated in the fall of 2014.

---

[1] In the interest of brevity, future reference to documents attached to this Complaint as Plaintiff's Exhibits will be in the form of "PX-[Number]."

22.    For example, Ulster Bank wrote:

You have worked with the Bank on a consensual asset disposal strategy and to date you have worked in a fully cooperative manner with the Bank on a mutually agreed divestment strategy.

In all aspect of these [enumerated prior] transactions the Bank have found your strategic / management ability undoubted and prior to the downturn in the economy and overall collapse of the property market you maintained an exemplary repayment record with the Bank.

23.    Bank of Ireland ("BOI") wrote:

Mr. Kelleher has had a relationship with BOI for over 20 years with significant borrowings to him and Shelbourne Developments Limited.  The bulk of this debt was repaid in full during 2008.

During this time Mr. Kelleher and his colleagues in Shelbourne were professional to deal with and were experienced property developers and investors both in Ireland and internationally.

24.    Thus these documents show that the cooperation and involvement of Kelleher and his Shelbourne companies was instrumental in resolving significant indebtedness to leading Irish financial institutions and that when times proved unexpectedly hard through no fault of Kelleher or his companies, both they and he "did the right thing."

25.    Shelbourne attempted to do no less in respect of the Loans related to the Chicago Spire.

26.    The Anglo/Shelbourne "Facility" relating to the development of the Chicago Spire is described in detail below because it is highly relevant to the claims asserted herein.

27.    On July 1, 2011, Anglo and Irish Nationwide Building Society were merged by order of Michael Noonan, Ireland's then Finance Minister, who has since become the subject of substantial criticism both within and without the halls of the Irish Government for having aided and abetted the fire-sale of Ireland's assets to principally United States "Vulture Funds" to the long-term detriment of its citizens.

5

28.     The merged entity was named Irish Bank Resolution Corporation ("IBRC").

29.     As a consequence of the merger, Shelbourne's obligations previously owed in name to "Anglo" thus became owed to IBRC by operation of well-settled Irish corporate law.

30.     No change in the underlying documentation relating to the Spire Loans was required to transfer the obligations of Shelbourne to IBRC as the successor by merger to Anglo.

**NAMA, NALM, Their Creation and Principals**

    **The 2008 Financial Crisis**

31.     Like the United States, in the fall of 2008 Ireland was facing grave financial crisis.

32.     Due in significant part to real estate lending, all of Ireland's banks were facing insolvency.

33.     Indeed, Ireland had suffered the largest financial collapse of any developed country since the 1930's.

34.     Thus on September 29, 2008 Ireland issued its infamous "Bank Guarantee," whereby the Government guaranteed up to £100,000 of deposits for each depositor and, controversially, all lenders, including unsecured bondholders.

35.     This exposed the State to massive multi-billion-euro-debts and inevitably forced it into the arms of the EU Commission, the European Central Bank and the International Monetary Fund Bailout Program, commonly referred to as "The Troika."

36.     The Bank Guarantee proved to have been little more than a "Band-Aid" and thus proved to be a horrible idea that was undertaken without consulting Brendan McDonagh ("McDonagh"), a senior executive with the National Treasury Management Agency ("NTMA").

6

37.     NTMA was charged with handling the State's finances and ensuring access to the best bond yields and returns on the international market.

38.     In the weeks and months that followed the issuance of that Guarantee McDonagh, the then Attorney General, economists and Arthur Cox Solicitors were all central to discussions about the creation of a "bad bank" to whose balance sheet the now grossly under secured real estate development loans that were on the books of Ireland's major banks, including Anglo, could be transferred thus "cleaning up" the balance sheets of the Irish banks and then theoretically allowing them to successfully reenter the capital markets.

39.     In turn it was hypothesized that these banks would then be able to resume their crucial function of lending to commercial and other borrowers and thus help Ireland's economy recover.

40.     Unfortunately, time proved that the capital markets did not view the "purple bonds" on the balance sheets of Ireland's banks that they had received in exchange for their toxic assets any more favorably than the capital markets had viewed the toxic assets, so this grand plan failed.

41.     As a result the indigenous Irish banks have not yet been able to provide conventional lending to a level that can resolve the grave financial issues still confronting Ireland.

42.     Over centuries world-wide real estate markets generally have proven themselves to be cyclical.

43.     2010-2012 was definitely a down cycle period.

44.     The world's real estate markets have for the most part since recovered.

45.     As Shelbourne predicted and had brought to the attention of NAMA and its principals at the time, the real estate market recovered in the United States long before it began to recover in Ireland.

46.     For example, most major projects under construction in 2008 in the United States, other than the Spire, have since been completed.

47.     The Anglo indebtedness of all Shelbourne/Kelleher related entities, which aggregated roughly $600 Million, was only half of the issues confronting Kelleher.

48.     Indebtedness for real estate acquisition and development loans to all Irish lenders (including Anglo) owed by all Kelleher group entities as of 2008 totaled approximately $1.2 Billion.

49.     As described below, successfully completing construction of the Chicago Spire was the "lynchpin" to Kelleher's plan to address other obligations of other "Shelbourne" entities located in countries whose recovery from a World Financial Crisis he predicted (correctly) would lag behind that of the United States.

**NAMA and Its Affiliate NALM Are Created**

50.     Thus after many fits and starts Defendants National Asset Management Agency ("NAMA") and its affiliate National Asset Loan Management ("NALM") were born when the NAMA Act of 2009 became the law of Ireland on December 21, 2009.

51.     NAMA was in all practical effect a "start-up" real estate development/workout company, fully funded by the Irish government/tax payers, with a state imposed operating budget that was inadequate to hire competent real estate professionals that ended up employing even at its highest levels individuals with no relevant experience or training, who learned about real estate development "on the job" from some of the world's foremost real estate developers such

8

as Plaintiff and those foreign real estate professionals to whom NAMA effectively gave away enormously valuable real estate under NAMA's control for pennies on the dollar.

52.     Many of these same former NAMA employees are today, with the benefit of the education they received at NAMA at the expense of the Irish tax payers, now receiving rich compensation working for REITS and other real estate companies that own properties acquired from NAMA on the cheap.

53.     NALM is an indirect subsidiary of NAMA, which itself is 51% privately owned, and has no independence from NAMA and in all respects material to this action was controlled by NAMA.

54.     A copy of NAMA's current "corporate tree" downloaded from its website is attached hereto as PX-3.

55.     To the observation of Shelbourne, all acts (and failures to act) purportedly taken on behalf of NALM were taken by the same natural persons whose principal employer and business cards said NAMA.

56.     Indeed, Shelbourne learned of NALM's involvement with the Chicago Spire only after the events giving rise to this action had all occurred.

57.     Accordingly, unless specific circumstances warrant specific reference to NALM, NAMA and NALM are referred to below collectively as NAMA.

**NAMA's Leaders**

58.     After it was created McDonagh became NAMA Managing Director and later its Chief Executive Officer.

59.     McDonagh has spent his entire professional life as a certified public accountant and had no relevant experience in property development or finance, yet he was charged with acquiring some €77 Billion in distressed real estate loans.

60. Nothing on McDonagh's resume remotely suggested he was qualified to head a start-up company charged with managing one of the largest portfolio of loans ever assembled.

**John Mulcahy**

61.     McDonagh was joined by a team of advisors, headed by John Mulcahy ("Mulcahy").

62.     Together with Barden Gale, Mulcahy had been a non-executive director of the property advisory committee of the National Pension Reserve Fund (another NTMA subsidiary) since 2004 and for many years had been a partner and head of the Dublin office of Jones Lang LaSalle ("JLL").

63.     At all relevant times, JLL was arguably one of the largest and best known global commercial real estate agents and advisors regarding commercial, industrial or retail real estate.

64.     JLL had, however, little if any, relevant experience with residential properties such as the Chicago Spire.

65.     Mulcahy headed JLL's Dublin Office for many years, during which neither it nor he gained any experience with residential properties.

66.     JLL's Dublin's office was in the business of selling or leasing commercial real estate after it had been developed by someone else.

67.     In its best years, JLL's Dublin office generated no more than €22 Million of fee income all from commercial real estate advisory work and transaction fees.

10

68.     After playing a significant role in creating NAMA, Mulcahy was named Head of Portfolio Management.

69.     Among his principal responsibilities he was charged with overseeing the negotiations with the failed banks regarding the determination of the face amount of "purple bonds" they would receive in exchange for distressed/toxic loans being transferred to NAMA or a NAMA affiliate such as NALM.

70.     At all relevant times, Mulcahy pushed his underling Enda Farrell, who he had known from the NPRF, to endeavor to reduce the consideration paid by NAMA or one of its affiliates to the failed Irish bank for one of its toxic assets and then sought to maximize NAMA's recovery on that asset in order to make a profit for NAMA rather than minimize the loss the state guaranteed banks would take.

71.     While the profits of NAMA were in one sense ultimately paid to NTMA and in the same sense the losses resulting from guaranteed loans not being repaid were also born by NTMA, Mulcahy's self-aggrandizing agenda was clear.

72.     Mulcahy's principal concern was the financial performance of NAMA and its affiliates and not the realization of the financial potential of real estate development loans about which he and most members of the staff he hired in fact knew next to nothing and certainly had had no prior relevant experience.

73.     Mulcahy appeared to be more concerned with NAMA's performance than the costs that were ultimately being imposed upon the Irish tax payers as a consequence of the excessive and commercially unreasonable "haircuts" NAMA imposed on the indigenous banks .

11

74.     Upon the creation of NAMA, based upon his well-respected relationship building skills and clearly not relevant experience, Mulcahy's principal responsibility was disposing of €77 Billion of distressed real estate loans – a task for which he had no prior relevant experience.

75.     Mulcahy also had no relevant experience with respect to the security for most of the €77 Billion of distressed loans, namely real estate development projects at various stages of completion or planning.

76.     NTMA and NAMA could have better used Mulcahy's many, many contacts in the real estate world to have found someone actually qualified by real life experience to address the proper disposition of that €77 Billion of distressed property loans, the vast majority of which related to real estate development in need of "working out" due to the World Financial Crisis.

77.     Even if Mulcahy had been qualified, the successful accomplishment of Mulcahy's task was virtually impossible because NAMA, chaired by the former Anglo director and Head of the Irish Revenue Commissioners Frank Daly, were simply not prepared to pay salaries commensurate to the quality of real estate professionals this €77 Billion task required.

78.     Among many other things, the ultimate return achieved by NAMA on the portfolio of loans for which it assumed responsibility proves beyond any doubt the old adage that "one gets what one pays for."

79.     While head of the JLL Dublin Office, Mulcahy was a frequent visitor to its Head Office, which is located in Chicago.

80.     Accordingly, Mulcahy was very familiar personally with the Chicago Spire, which was the most significant real estate development project in that City in recent – or for that matter distant – memory.

12

81.     Thus when Mulcahy learned that the most important real estate project in JLL's home city came under his jurisdiction and that it involved at least $65+ Million, he instructed his underlings to keep him "in the loop."

**Sections 90 and 91 of the NAMA Act**

82.     There are two sections of the NAMA Act that are particularly significant to this case and therefore of which Shelbourne hereby gives express notice of reliance pursuant to Federal Rule of Civil Procedure 44.1, namely Sections 90 and 91.  They provide:

90.— (1) Subject to *subsection (7)*, the service of an acquisition schedule on a participating institution in accordance with <u>*section 87*</u> or <u>*89*</u> operates by virtue of this Act to effect the acquisition of each bank asset specified in the acquisition schedule by NAMA or the specified NAMA group entity, on the date of acquisition specified in the acquisition schedule as the date of acquisition of the bank asset, notwithstanding that the consideration for the acquisition has not been paid.

(2) The acquisition of a bank asset pursuant to *subsection (1)* is subject to the terms and conditions set out in the acquisition schedule and any general terms and conditions specified by NAMA under <u>*section 86*</u> *(1)* except to any extent that the acquisition schedule excludes or modifies such specified terms and conditions.

(3) Unless otherwise provided in an acquisition schedule, where an eligible bank asset is acquired, every relevant contract is deemed to be assigned to NAMA or the specified NAMA group entity, as the case may be.

(4) In *subsection (3)* " relevant contract " means a contract—

(*a*) relating to the bank asset,

13

(*b*) to which the participating institution is a party or in which it has an interest, and

(*c*) the existence of which has been disclosed to NAMA in writing.

(5) Unless otherwise provided in an acquisition schedule*,* where an eligible bank asset is acquired, NAMA or the specified NAMA group entity, as the case may be, becomes entitled to the benefit of—

(*a*) any certificate of title, solicitor's undertaking, warranty, valuation, report, certificate or document issued to the participating institution or upon which the participating institution is entitled to rely in connection with the asset, (*a*) any certificate of title, solicitor's undertaking, warranty, valuation, report, certificate or document issued to the participating institution or upon which the participating institution is entitled to rely in connection with the asset,

(*b*) an instruction, order, direction, bond, opinion, search, enquiry, declaration, consent, notice, power of attorney, authority or right given to, held by or issued for the benefit of, directly or indirectly, the participating institution in connection with the asset, and

(*c*) any other benefit arising under or in connection with any insurance or assurance policy or payment direction relating to the asset.

(6) Subject to <u>*section 91*</u> , *subsections (1)*, *(3)* and *(5)* have effect in relation to a bank asset notwithstanding—

(*a*) any legal (including contractual) or equitable restrictions on the acquisition of the bank asset or any part of it,

14

(*b*) any legal or equitable restriction, inability or incapacity relating to or affecting any matter referred to in the acquisition schedule (whether generally or in particular) or any requirement for a consent, notification, authorization, license or document to similar effect (by whatever name and however described), in each case,

(*c*) any insignificant or immaterial error or any obvious error, or

(*d*) any provision of any enactment to the contrary.

(7) The service of an acquisition schedule on a participating institution in accordance with *sections 87* and *89* does not have the effects mentioned in *subsections (1)*, *(3)* and *(5)* in relation to a bank asset if—

(*a*) notwithstanding that the participating institution stated in information provided under *section 80* that it did not consider the bank asset to be an eligible bank asset, and that it objected to its acquisition NAMA decided under *section 85 (3)* to take steps to acquire the bank asset, and

(*b*) on the acquisition date—

(i) the Minister has not confirmed the inclusion of the bank asset in the acquisition schedule in accordance with *section 117* , or

(ii) NAMA—

(I)    has amended the acquisition schedule to remove the bank asset from the acquisition schedule, or

(II)    has revoked the acquisition schedule in accordance with *section 89* or *121* .

15

91.— (1) In this Part— foreign bank asset " means a bank asset in which the transfer or assignment of any right, title or interest that NAMA proposes to acquire is governed in whole or in part by the law of a state (including the law of a territorial unit of a state) other than the State; " foreign law ", in relation to a foreign bank asset or a transaction in relation to a foreign bank asset means the law of a state other than the State.

(2) In this section, where a bank asset is to be acquired by a NAMA group entity, a reference to NAMA in this section (but not in *sections 92* and *93* as applied by *subsection (10)*) shall be construed as a reference to the NAMA group entity.

(3) To the extent that a bank asset proposed to be acquired by NAMA is or includes a foreign bank asset—

(*a*) if the law governing the transfer or assignment of the foreign bank asset permits the transfer or assignment of that asset, the participating institution shall if NAMA so directs do everything required by law to give effect to the acquisition, or

(*b*) if the relevant foreign law does not permit the transfer or assignment of the foreign bank asset, the participating institution shall if NAMA so directs do all that the participating institution is permitted to do under that law to assign to NAMA the greatest interest possible in the foreign bank asset.

(4) A participating institution, to the extent that a foreign bank asset is one to which *subsection (3) (b)* applies—

(*a*) is subject to duties, obligations and liabilities as nearly as possible corresponding to those of a trustee in relation to that bank asset, and

16

(*b*) shall hold the bank asset for the benefit and to the direction of NAMA, in each case subject to the nature of, and the terms and conditions of the acquisition of, the foreign bank asset.

(5) *Subsection (3)* applies in so far as the service of an acquisition schedule would not, of itself, as a matter of foreign law, operate to give effect to the acquisition of a foreign bank asset or otherwise effect or achieve the result referred to in that subsection in relation to such a bank asset.

(6) Without prejudice to *subsection (4)*, a participating institution shall, immediately upon being so directed by NAMA to do so, execute and deliver to NAMA any contract, document, agreements, deed or other instrument that NAMA considers necessary or desirable to ensure that there is effected a binding acquisition by NAMA or the NAMA group entity concerned, under the applicable law, of the interest specified in the relevant acquisition schedule. NAMA may issue more than one direction under this subsection in connection with a foreign bank asset.

(7) A trust, duty, obligation or liability created or constituted by this section shall not be taken to constitute a security.

(8) A participating institution shall comply with any direction of NAMA in relation to any duty, obligation or liability under this section.

(9) A participating institution shall obtain, make, maintain and comply with any authorization, consent, approval, resolution, license, exemption, filing, notarization or registration that is necessary in the State and in any other place in connection with ensuring the legality and enforceability of any act, matter or thing referred to in this section. (9) A participating institution shall obtain, make, maintain and comply with any

17

authorization, consent, approval, resolution, license, exemption, filing, notarization or registration that is necessary in the State and in any other place in connection with ensuring the legality and enforceability of any act, matter or thing referred to in this section.

(10) *Sections 92* and *93* apply with any necessary modifications in relation to a foreign bank asset.

83.     Section 91 of the NAMA Act recognized that, as a matter of international law, Ireland was powerless to enact legislation governing the transfer of property/asset located outside of its borders whose transfer was governed by "foreign law."

84.     Section 91 therefore requires NAMA to perfect any transfers to it (or an affiliate) of any such property/asset in accordance with the law of the state/country in which the property/asset is located.

85.     This includes, without limitation, the transfer of any "beneficial interest" in such property/asset.

**Background of This Action**

86.     The "Chicago Spire," at 2,000 feet will be the tallest residential building in the North America and when it began it would have been the tallest residential building in the world.

87.     To date Shelbourne has over $225 Million of its own cash invested and $300 Million of equity in the Project that it still hopes to complete because for the reasons explained below Shelbourne remains the only person logically capable of completing it because it still owns the intellectual property necessary to construct it and it still maintains the good will of the diverse governmental and community interests without which a project of this dimension would be doomed..

18

88.     This iconic structure, representing the last major undeveloped site in downtown Chicago on the famous Lake Michigan shoreline, is to be situated on 2.2 acres within a 7 acre Peninsula bounded by the Chicago River, Lake Michigan and Ogden Slip that Shelbourne and its affiliates had assembled.

89.     Beginning in July 2006 Shelbourne assembled an international "Best in Class" team of international architects, engineers, market researchers, construction companies and marketing specialists to determine the feasibility of this Project and ultimately to proceed with it.

90.     In total, Shelbourne and its affiliates employed over 30 consultancy firms.

91.     Shelbourne engaged the world renowned Spanish architect, structural engineer, sculptor and painter Santiago Calatrava to design the breath taking Chicago Spire.

92.     Mr. Calatrava's other celebrated structures include the Lisbon Train Station, the Bilboa Airport, the Milwaukee Art Museum, the Athens Olympic Sports Complex, the City of Arts and Sciences and Opera House in Valencia, the Margaret Hunt Hill Bridge in Dallas, the Peace Bridge in Calgary Canada and the WTC Hub in New York City.

93.     His design for the Chicago Spire obtained world-wide acclaim and is symptomatic of the extraordinarily high quality that Shelbourne brought to all aspects of the Project.

94.     By May 2007, having completed Phase II environmental work prior to commencing the substructure works, at considerable expense, via both Shelbourne and a network of other companies he owned, Kelleher obtained not only all the required zoning and permitting from a plethora of federal, state and City authorities, but Shelbourne and its affiliates also obtained easements and other rights in respect of the adjoining roughly 5 acres, which is owned by the City of Chicago, collectively referred to as the "Other Kelleher Related Rights."

19

95.     Shelbourne was successful in securing the strong support of the Mayor's Office combined with all of the diverse, local community interest groups for the construction of this iconic building.

96.     Once the City and all other stakeholders were behind the Project things went more smoothly than one would normally anticipate.

97.     While the complete explanation from a technical perspective is, like the entire Project, complicated, the reality is without either (a) the Other Kelleher Related Rights or (b) a new developer successfully obtaining something that approximates the Other Kelleher Related Rights, the Spire could not be constructed.

98.     The cost of obtaining something equivalent to the Other Kelleher Related Rights is daunting and there is no guarantee that such an endeavor would be successful.

99.     While without any doubt the Other Kelleher Related Rights were obtained based upon the merits of the Project, the good reputation that Shelbourne had earned over 20 years in Chicago in particular and Kelleher had earned in the international real estate development community in general necessarily played some positive role in Shelbourne's quest for these rights.

100.    Shelbourne and Kelleher's good standing in the Chicago community was evidenced, among other ways, by Mayor Daly's request that Kelleher assist the City in its bid for the 2016 Olympic Games.

101.    The importance of the Kelleher Related Rights is readily illustrated by the fact that the existing, completed, and structurally integral substructure of the Spire exists in part on land that is not only within the 2.2 acre Spire Site, but also extends into the adjoining 5 acres that is owned by the City of Chicago.

20

102.     Without the Other Kelleher Related rights, portions of that $300 Million substructure cannot be used.

103.     The two facts that (a) the City of Chicago is committed to the development of this last "important" lakefront site at the estuary of the Chicago River by the construction of an architecturally significant building, i.e. the Chicago Spire or equivalent, and (b) the Spire cannot be constructed without the Other Kelleher Related Rights, or equivalent, explains why the site remains today a large unsightly hole in the ground.

**Pre-Sales Began**

104.     By the end of 2007, at a cost of approximately $10 Million, Shelbourne constructed a museum quality "Sales Center" occupying a full floor of the NBC Tower in Chicago that overlooked the Spire site and contained exemplar units.

105.     Beginning in January 2008, pre-sales of condominiums began on a global basis.

106.     This was the first Chicago project to be marketed in this manner with the support of many diverse civic organizations.

107.     As a general matter, the citizens/tax payers of Chicago were proud of this Project; viewed it as a positive development for their City; and in their own different ways lended their help to its success in whatever way they could.

108.     Circa 370 of 1,200 condos were sold, half of which were sold to persons residing outside of the United States.

109.     This was due in some part to the fact that these special, luxury units sold for roughly between $900 a square foot to $3,600, with an average of $1,400 per square foot.

110.     These were favorable prices compared to other comparable luxury units in less significant buildings in other cities.

111.    As was widely reported in the press, the 10,000 square foot duplex pent house at floors 141 and 142 was sold to Ty Warner, the then owner of the Four Seasons, New York, for $36 Million.

112.    Shelbourne engaged a firm of United Kingdom solicitors with global offices well familiar with international projects to make certain that its sales activities were compliant with the laws in the countries in which Shelbourne was engaging in sales activities and in the United States, paying special attention to laws governing "money laundering."

113.    Shelbourne successfully engaged J.P. Morgan Private Bank to pre-approve prospective purchasers for mortgages.

114.    Sales continued to flourish based upon glamorous sales events held in Chicago, Singapore, Dublin, Hong Kong, Kuala Lumpur, Jakarta, Beijing, Shanghai, Cape town, Johannesburg, Abu Dhabi, Doha, London and New York City.

115.    In the meantime, construction proceeded on schedule.

116.    The entire design, marketing, sales, foundation and substructure of the Spire was completed at a cost of some $300 Million.

117.    This $300 Million included the cost of the IP necessary for the plans for the entire Project, which Shelbourne still owns.

118.    The Spire site acquisition and development was funded by a $225 Million equity investment by Shelbourne and a further $90+/- Million advanced pursuant to a Loan Facility with Anglo, which was guaranteed personally by Kelleher, whose details are discussed below.

119.    In August 2008, Anglo's ability to keep funding this and all other real estate development projects as it had historically done evaporated due to the Irish financial crisis.

22

120.    As noted above, the Chicago Spire Project was in every sense on – or ahead of – schedule.

121.    So too was the payment of Shelbourne's obligations under its Loan Facility.

122.    Accordingly given their historic relationship, Shelbourne had every reasonable expectation for Anglo to continue to lead the funding of the Project through its completion as Tony Campbell had initially indicated.

123.    Not only did Anglo disappear as a funding source for a credit worthy project such as the Chicago Spire, but so too did alternative funding sources due to the World Financial Crisis.

124.    By ironic comparison, Trump Tower in Chicago began construction some 9 months earlier than the Chicago Spire with Deutsche Bank and Credit Suisse as its principal funders.

125.    When the crisis occurred, those banks continued to invest their then very limited capital in completing the Trump Project in order to preserve the funds already invested.

126.    Thus, Trump Tower was completed and its loans ultimately honored.

127.    By comparison, due to the collapse of the Irish economy, Anglo had no funds to invest to save its investment.

128.    With no continuing source of funds, the Spire Project, which was very much "on track," came to a grinding and painful halt.

129.    By this time, Kelleher had either sold, or refinanced, all other assets available to him in order to provide funding for the Spire Project.

130.    Thus neither Shelbourne nor Kelleher had further liquidity with which to address the crisis.

**The Purported Transfer of the Spire Loans and Other Kelleher Guaranteed Loans to NAMA As Part of the "Shelbourne Connection"**

131.    At the time of the financial crisis, the Spire represented only a portion of the problem that Anglo and ultimately Kelleher confronted together.

132.    Companies owned wholly, partially, directly or indirectly by Kelleher, whose debt he guaranteed personally either entirely or in part owed Anglo on the order of $600 Million of which only roughly $90 Million related to the Spire and of that roughly $90 Million, $6 Million was owed by Milltown.

133.    In addition, other Kelleher owned real estate companies owed other Irish banks another roughly $600 Million, bringing the total aggregate debt that as CEO of all of these companies Kelleher had to address to approximately $1.2 Billion.

134.    All of this debt related to real properties developed or being developed.

135.    As noted above, NAMA was created as a "bad bank" on December 21, 2009 to acquire property development loans from Irish banks in return for government purple debt bonds ostensibly with a view to improving the availability of credit in the Irish economy.

136.    Kelleher was advised by both Anglo and NAMA in or about October 2010 that "his loans," including the Chicago Spire related loans, would be transferred to NAMA from Anglo as part of "Tranche 3" on November 1, 2010.

137.    "His Loans" were referred to collectively by NAMA as the "Shelbourne Connection" and assigned **collectively** Account No. 0051.

138.    No juridical entity named the "Shelbourne Connection" ever existed anywhere.

139.    The "Shelbourne Connection" was a term of art created by NAMA to describe generally loans to entities in which Kelleher had an interest and generally were personally guaranteed in whole or in part by him.

24

140.     From October 2010, until the bitter end, both Shelbourne and Kelleher dealt with various personnel of NAMA and otherwise conducted their affairs in relation to the Chicago Spire debt as though this representation by NAMA regarding its ownership of the Spire Loans were true.

141.     There was no reason for Kelleher or Shelbourne to have believed or even suspected that Anglo's and NAMA's representations regarding ownership of the Spire Loans were not true.

142.     There was no reason at any relevant time for Kelleher or Shelbourne not to have relied in good faith upon Anglo's and NAMA's representations regarding NAMA's  ownership of the Spire Loans.

143.     At all relevant times, NAMA conducted itself in a manner wholly consistent with its representations regarding ownership of, among other things, the Chicago Spire Loans.

144.     It was only after Shelbourne suffered the damages for which recovery is sought herein that it learned through discovery proceedings in other cases and through its own investigation that Anglo's and NAMA's representations regarding NAMA's ownership of the Spire Loans were completely false.

145.     As discussed below, the ownership of those Loans remained with IBRC (as successor by merger to Anglo) until May 21, 2013, when, in conformity with Section 91 of the NAMA Act, ownership of the Spire Loans was transferred to NALM.

**The Illinois State Court Foreclosure Proceeding**

146.     As a result of the cessation of cash flow, in September 2010, Lorig Construction Company ("Lorig"), a minor contractor owed approximately $500,000, which had previously

filed a mechanics lien, commenced a foreclosure lawsuit in the Circuit Court of Cook County Illinois (the "Foreclosure Proceeding").

147.    Lorig has constructed the valuable ramps into the substructure off of Lakeshore Drive that lead to a seven level subterranean 1,400 vehicle parking facility whose structure had already been completed.

148.    A portion of this structure was constructed on land owned by the City of Chicago, pursuant to the terms of certain of the Other Kelleher Rights.

149.    Under the law of Illinois, a mechanic's lien can, but need not necessarily, have priority over a first mortgage on real property depending upon specific facts.

150.    In substance, if the work underlying the mechanics' lien increased the value of the real property then the lien will enjoy priority over the first mortgage in the amount of such increased value.

151.    In October 2010 Anglo, represented by Quarles & Brady, who later proved to be NAMA's regular Illinois counsel, filed a "defensive" foreclosure action to assert its interest in the dirt by reason of its first mortgage.

152.    This filing by Anglo in October 2010 occurred one month before Shelbourne was advised its loans were being transferred to NAMA as part of the "Shelbourne Connection" in "Tranche 3."

**The September 2011 Interim Support Agreement**

153.    NAMA considered and rejected various business plans proposed by Shelbourne that contemplated NAMA funding completion of the Spire or some alternative project.

26

154.    Mulcahy had also rejected Shelbourne's proposal to advance approximately $10 Million to "stabilize" the Project by dealing with existing lien litigation and otherwise "keep the lights on."

155.    By the fall of 2011 NAMA and Shelbourne/Kelleher were at a crossroads.

156.    NAMA desperately needed Kelleher's personal cooperation in order to meet its purported goal of maximizing its return on security for the Anglo Loans it claimed to own in the form of the Spire Project.

157.    Shelbourne desperately wanted to complete the Project because it believed that the United States economy was "on the turn" and the recovery of the Irish economy was likely a number of years behind the United States.

158.    Thus, completion of the Spire Project afforded Kelleher the means with which to deal with his overarching problems with other Irish loans.

159.    At the outset, NAMA acknowledged that it had absolutely no competency in respect of the United States real estate market.

160.    In the Chicago Spire, NAMA was confronting unquestionably a complex project that only an experienced real estate developer would have the competency to undertake.

161.    From Shelbourne's perspective it was clear that Project Financing needed to be found elsewhere or it (and Kelleher as the Guarantor of its indebtedness) would have to face the consequences of the indebtedness to NAMA as the purported successor to Anglo.

162.    That said, in November 2011 Shelbourne's ability to find financing to redeem its Loans at par, including accrued interest, was a challenging proposition although "green shoots" were beginning to appear in the U.S. real estate market.

163.     Most importantly, NAMA, as the purported owner of the Spire Loans and therefore the real party in interest in the pending Foreclosure Proceeding, needed Selbourne's and Kelleher's help desperately in connection with the Foreclosure Proceeding because NAMA needed an appraisal of the mortgaged property in order to oppose the claims of several mechanics lien holders.

164.     In a letter from NAMA's Chicago Counsel dated September 9, 2011, sent in order to induce Shelbourne to sign an "Interim Support Letter" that NAMA's counsel had already drafted and sent to Shelbourne's counsel, NAMA stated:

> There can be no reasonable doubt that the property can be sold for a price anywhere near the total amount owed to all parties in the Spire [foreclosure] litigation.  Furthermore, because there is no way to cause the property to be sold free and clear of all liens, except for a judicial foreclosure sale, we have to proceed in that manner.
>
> * * *
>
> There is a very practical solution to the property owner's involvement in this case and the solution has been delivered to you in the form of a Stipulated Judgment of Consent Foreclosure.  If your client is seriously interested in efficiently resolving this matter, the owner's agreement to that form of foreclosure would be a meaningful first step.

A copy of that letter is attached as PX-4.

165.     At a judicial foreclosure sale, Shelbourne would have had the opportunity to bid on the Spire Site "free and clear of all liens."

166.     Although Shelbourne did not technically own the Other Kelleher Related Rights, it had ready access to them.

167.     Thus, together with an investor, it could contribute those interests and its other intellectual property so as to be able to be the highest bidder.

168.     Its bid – at public auction – needed only be the highest and not the full amount of the debt.

169.    With this opportunity foremost in Shelbourne's mind, NAMA and Shelbourne struck a deal that "pinched both of their toes" that was memorialized in an agreement drafted by NAMA dated 16th September 2011 labeled "Strictly Private and Confidential Addressee Only" and signed by both Kevin Nowlan and Peter Malbasha ("Malbasha") of NAMA (the "September 2011 Interim Support Agreement").

170.    This document was signed by Kelleher on September 23, 2011.

171.    From NAMA's perspective, the September 2011 Interim Support Agreement (drafted by NAMA's Illinois counsel) obliged Shelbourne and Kelleher to provide it with all of the highly confidential information it needed in order to understand the hugely complex, partially developed Spire Project in order to formulate a meaningful appraisal of it for use in the Foreclosure Proceeding in general and to oppose the claims of the mechanics lien holders in particular.

172.    Such an appraisal was critical to NAMA's litigation of the priority of the mortgage on the Spire site that secured what it falsely claimed to be the Spire Loans that it owned.

173.    As noted above, as of September 2011, in excess of some $300 Million had already been spent in development.

174.    A copy of the September 2011 Interim Support Agreement is attached hereto as Plaintiff's Exhibit 5.

175.    Paragraph 2(d)(iii) of the September 2011 Interim Support Agreement states in pertinent part that:

(d) [Shelbourne/Kelleher] must comply with the following conditions (to the full satisfaction of NAMA) within the timeframes specified:

\* \* \*

(iii)  [Shelbourne/Kelleher] to co-operate with and facilitate the Receiver in relation to all dealings regarding the Spire development, Chicago.  In particular [Shelbourne/Kelleher] shall not contest the pending or proposed foreclosure lawsuit and shall fully and actively cooperate with such legal proceeding and shall execute, sign, complete and deliver all and any documentation in relation to same as and when required by NAMA and/or Anglo-Irish Bank plc.  Furthermore and without derogating from the generality of the foregoing, [the Mortgagee, whose debt was personally guaranteed by Kelleher] shall agree to a **"Consent Foreclosure"** and shall sign all necessary documentation in that regard to help expedite matters and shall attend to same immediately upon receipt of all relevant documentation and in any event within one month from the date hereof.

(Emphasis added.)

176.    "Consent Foreclosure" is a phrase of art generally in the United States and is typically governed by state statute.

177.    In Illinois it is Section 15-1402 of the Illinois Foreclosure Act.

178.    In material part it provides for the release of all personal guarantees.  In other words, in the United States, when a lender asks a corporate borrower as part of a "workout deal" to agree to a "Consent Foreclosure" that is plain English shorthand for "we will release Shelbourne principal's personal guarantee" as part of defined court proceedings that have a defined time table by law.

179.    Before entering into the September 2011 Interim Support Agreement, Malbasha of NAMA confirmed by an e-mail to Shelbourne dated August 17, 2011 that "by procuring an order of foreclosure, the marketability of the Spire site will be greatly improved and its value will therefore be maximized."

180.    In so many words that e-mail re-affirms NAMA's commitment to have "the foreclosure process finished out and finalized."

30

181.    In order to induce Shelbourne to sign the September 2011 Interim Support Agreement, NAMA threatens in this e-mail to withhold the payroll of Shelbourne's staff, who had already worked 17 days working on NAMA assets.

182.    This threat approaches extortion, if it does not in fact constitute it.

183.    In reliance upon NAMA's promise to fund its day to day operations, Shelbourne had asked loyal staff members to come to work for over two weeks with the understanding that they would be paid their salaries for their efforts.

184.    Now NAMA was placing Shelbourne in the position of having to tell these hard working people that it could not pay them as it had promised.

185.    Not paying hard working loyal staff was not an option that Shelbourne could entertain.

186.    NAMA's extortion was, however, good reason for Shelbourne to have believed and then to have relied upon NAMA's frequently stated commitment to completing the foreclosure process so that the property could be sold free and clear of all liens.

187.    Again, as part of that Illinois statutory process, Shelbourne could have acquired the Spire Site by simply being the highest bidder, not paying the total amount it owed, which played a substantial part in Shelbourne succumbing to NAMA's extortion.

188.    Putting NAMA's unseemly extortion to the side, the consideration for Shelbourne and Kelleher for entering into the September 2011 Interim Support Agreement consisted essentially of three things, namely (a) time;  (b) a release of Kelleher's personal guarantees of the Spire Loans; and (c) the potential to purchase the  Spire site at judicial auction for a sum less than the full amount due under the Loans.

31

**Neither NAMA Nor NALM Owned The Loans NAMA Publicly Offered For Sale and To Which The September 2011 Interim Support Agreement Related**

189.    Perhaps the most shocking fact about this case is that NAMA never, ever owned the Spire Loans it so publicly offered for sale.

190.    Its affiliate, National Asset Loan Management Limited ("NALM"), did not acquire the Chicago Spire Loans until May 21, 2013 – after literally all of the events giving rise to the principal claims of Shelbourne asserted herein.

191.    This fact is not subject to reasonable dispute as the transfer documents – all dated May 21, 2013 – from IBRC – **not to NAMA** – but rather to NALM, a "NAMA group entity" within the meaning of the NAMA Act, are attached hereto as PX-6, PX-7 and PX-8.

192.    Indeed consistent with the fact that no transfer of the Anglo/IBRC Loans occurred before May 21, 2013 is the fact that in a Certificate issued by NAMA in 2014 attesting to transfers of Loans to NALM in November 2010, the Spire Loans are not scheduled.

193.    A copy of this NAMA Certificate is attached as PX-9.

194.    The reasonable beliefs of all concerned (except NAMA, which obviously knew better) that NAMA owned the Spire Loans explained the conduct of Shelbourne and others described below.

195.    NAMA falsely claiming that it owned the Spire Loans had enormous legal and practical significance.

196.    Common experience teaches that a failed or failing real estate developer is a logical participant in any "Work Out" of a failed real estate development loan.

197.    That was particularly true in the case of the Chicago Spire given the critical need for the Related Kelleher Rights in order to complete the Spire Project.

198.    The NAMA Act flatly prohibits NAMA (or any NAMA affiliate such as NALM) from selling any defaulted loan it acquires from a failed Irish bank (such as Anglo/IBRC) to the defaulting borrower or any entity in which a defaulting borrower has any interest or affiliation.

199.    No such legal restriction applied to IBRC.

200.    This disparity (with the Irish tax payer ultimately paying the ultimate bill flowing from it) has been the topic of considerable discussion in the Irish press and before the Irish Oireachtas (its legislative body).

201.    Thus NAMA's deceit as to the purported assignment of the Chicago Spire Loans to it resulted in Shelbourne not knowing that it could propose a "Work Out" of those Loans to IBRC, which was at liberty under Irish law to accept an offer to pay-off those Loans on terms that resulted in a recovery of far less than 100% of all principal, interest and penalty interest then due.

202.    That same deceit prevented IBRC and its Special Liquidators from knowing of Shelbourne's interest and ability to resolve its indebtedness at a sum of money vastly higher than the creditors of IBRC ultimately received.

203.    Indeed, both before and after April 30, 2013, IBRC and/or its Special Liquidators accepted "Work Outs" of real estate development loans that resulted in recoveries of less than 100% of all principal, interest and penalty interest due in respect of those loans.

204.    In reports to NTMA and other bodies of the government of Ireland, IBRC and/or its Special Liquidators has stated in substance that such "Workouts" represented successes under the circumstances.

**NAMA's Appointment of JLL To Aid It in Preparation of An Appraisal of the Spire Site, As If It Actually Owned the Loans Secured by That Site.**

205.    As noted above, not surprisingly Mulcahy hired his old firm, JLL, whose head office is in Chicago, to be NAMA's agent in respect of the most prestigious real estate project in the City.

206.    Between September 2011 and into 2013 Shelbourne, Kelleher and NAMA proceeded exactly as the September 2011 Interim Support Agreement contemplated.

207.    The Shelbourne parties cooperated beyond any reasonable measure with NAMA in terms of disclosing to its Chicago based agent and Mulcahy's former employer, JLL, all of their confidential information relating to the Spire Project thus enabling JLL/NAMA to create a virtual Data Room so that the extraordinarily complex task of preparing an appraisal of the partially completed Spire Project could be completed for use in the pending Foreclosure Proceeding.

208.    Part of that process included assisting NAMA, its counsel Quarles & Brady and their consultants and appraisers in evaluating the value of each of the mechanics' liens.

209.    In addition, as part of his overall duty of cooperation to NAMA, Kelleher also provided NAMA with complete information relating to other companies within the NAMA named "Shelbourne Connection" as well as personal financial information, including personal financial statements.

210.    From September 23, 2011, Shelbourne relied the upon the terms of the September 2011 Interim Funding Agreement, which it signed so that the property "could be sold free and clear of all liens" at a judicial foreclosure, which was according to NAMA's counsel (as well as its own) the only way such a thing could be accomplished.

34

**Breach of the September 2011 Interim Support Agreement By the Sale of the Loans**

211.    In violation of the September 2011 Interim Support Agreement, NAMA ultimately offered for sale very publicly and then sold the defaulted Shelbourne Spire Loans, with Kelleher's personal guarantees still attached.

**Undisclosed Agency of NAMA for IBRC**

212.    In an internally inconsistent document on the letterhead of JLL dated 13 March 2013, JLL initially states that it has been exclusively instructed by NALM to obtain offers for the acquisition of $92.8 Million of par debt matured loan collateralized by the Spire Site.

213.    The same document never again refers to NALM, but makes statements to the effect that "a draft of the loan sale and purchase deed to be entered in between NAMA and the successful bidder" will be available in the Data Room [a defined term]" and that "NAMA is under no obligation to accept the highest bid or any bid at all."

214.    This document was available only to individuals who signed a Non-Disclosure Agreement described below representing that they had had no contact with Shelbourne or any of its affiliates or principals.

215.    Accordingly Shelbourne could not and did not obtain a copy of this letter until after it suffered the damages for which recovery is sought herein.

216.    A copy of this document is attached as PX-10.

217.    PX-10 also states that the "Draft Deed will be made available in the Data Room for information purposes only."

218.    In contemplation of litigation, Shelbourne obtained from Philip Sylvester, an unsuccessful bidder for the Spire Loans, a copy of the "Loan Purchase and Sale Agreement" he actually submitted to JLL as part of his attempt to purchase the Spire Loans.

219.    According to Mr. Sylvester this form of "Loan Purchase and Sale Agreement" was included in the "Bid Package" given to all bidders who had otherwise complied with the bidding requirements identified below as PX-12 through PX-14 and presumably was the "Deed" to which reference is made in PX-10.

220.    A copy of the Loan Purchase and Sale Agreement ("LSA") as submitted to JLL by Mr. Sylvester is attached as PX-11.

221.    Section 5.1(b) of the LSA contains Representations and Warranties by Seller as to the Loan as of the Closing Date and states:

> **Ownership by NALM.**  NALM hereby represents and warrants to Purchaser with respect to the Loan as of the Closing Date that NALM holds all of the interests in the Loan that NALM acquired from IBRC pursuant to the terms, and operation of the NAMA Act, and to that to the best of NALM's knowledge and belief the terms of the said acquisition represents the entire beneficial interest in the Loan and NALM has not made any prior sale, transfer, release, waiver or sub-participation of its interest in the Loan.

> **Ownership by IBRC.**  IBRC hereby represents and warrants to Purchaser with respect to the Loan as of the Closing Date that IBRC holds all residual interests in the Loan that did not transfer to NALM pursuant to the terms, and operation, of the NAMA Act and that this represents the legal interest in the Loan and IBRC has not made any prior sale, transfer, release, waiver or sub-participation of its interest in the Loan other than the transfer of the Loan to NALM in terms of the NAMA Act.

222.    Again, the Spire Loans are not listed in PX-9 as among those "Shelbourne Connection" Loans transferred to NALM in 2010 and, moreover, because they are United States assets, pursuant to Section 91 of the NAMA Act, could only have been transferred via documentation such as PX-6 through PX-8, which are all dated May 21, 2013.

223.    Thus the LSA is conclusive evidence that NAMA and NALM were acting as the agents of IBRC in respect of the Spire Notes and the Mortgage and Security Agreement securing those Notes until such time as the Notes were actually transferred to NALM on May 21, 2013.

**JLL's Misleading Information Resulting In Few and Low Bids**

224.    Shelbourne learned long after the fact that JLL prepared a Confidential Memorandum that was made available to potential bidders that contained grave material misstatements of fact that it would have corrected had it been afforded the opportunity to review it for its accuracy.

225.    Among those misstatements of fact was a misstatement to the effect that planning and zoning for the Project was expiring in May 2013, some 14 months earlier than it actually was due to expire and likely before the bid process could be completed.

226.    Those misstatements of fact gravely adversely affected the price for which any reasonable, willing purchaser would pay for the Spire property, especially a global real estate developer or investor.

227.    NAMA Barrister, Mr Brian O'Moore Senior Counsel boasted in proceedings in the High Court in Dublin that JLL had marketed the Spire Loans globally and that it had received hundreds of expressions of interests.

228.    However, neither  Mr. O'Moore nor NAMA's team of solicitors, in-house lawyers and executives were able to answer Mr Judge Fullam of the Irish High Court's question regarding the number of bids JLL actually received.

229.    Clearly no knowledgeable or sophisticated international investor/developer would have wished to become embroiled in a Project the size and complexity of the Chicago Spire under the (false) impression that the site had no planning or zoning approvals.

230.    Had potential bidders understood that were construction to resume before September 2014 planning and zoning approvals would not be an issue, the number and amount of bids obviously would have been greater.

37

231.    Upon information and belief, the JLL Memorandum was so materially misleading by knowing admission as to be fraudulent because it failed to disclose the existence and importance of the Related Kelleher Rights.

232.    The Virtual Data Room, which had originally been created to assist in the preparation of the Spire Appraisal needed for the Foreclosure Proceeding, was converted for use in aid of selling the Spire Loans in breach of the very Agreement that created it.

233.    Indeed the Data Room created for the purpose of preparing the Spire Appraisal for use in the Foreclosure Proceeding was converted to the Data Room used by NAMA for the express purpose of breaching the September 2011 Interim Support Agreement.

**Special Conditions to Bidding/Sale Process**

234.    A condition of access to the Data Room; receiving the JLL Report; bidding for the Spire asset; and being the successful bidder was a representation by an interested party that it had and would have no association, assistance or even communication with Kelleher, Shelbourne or any of its affiliates or any professionals or consultants previously employed by Shelbourne or its affiliates.

235.    Because at the time the bids were being sought, the Loans still actually had not yet been transferred to NAMA, NALM or any other NAMA affiliate in accordance with Section 91 of the NAMA Act, these restrictions were completely unnecessary and materially drove down the price of all bids, particularly taking into account the value of the Related Kelleher Rights.

236.    Copies of NAMA's Offer for Sale of Loans it did not own; the related Non-Disclosure Agreement ("NDA") and related Bidding Instructions confirming these facts are attached as PX-12, PX-13 and PX-14.

**Shelbourne's Timely Offer to Redeem Its Defaulted Loans at Par, i.e. $92+/- Million, Before Either Their Sale To a Third-Party or the Occurrence of a Foreclosure Sale**

237.    While fulfilling its obligations under the September 2011 Interim Support Agreement on a more than timely basis, Shelbourne put the time that it "bought" with that agreement to good use.

238.    Shelbourne found an investor ready, willing and able to advance $92+/- Million to fund the redemption of the Spire Loans at par (meaning 100% of all monies actually owed) so that they could regain control of the Spire site and then go on to finish construction of the Chicago Spire.

239.    This would have been a "win/win" situation for all concerned.

240.    The Irish tax payers would not have lost so much as a penny, including accrued interest.

241.    The citizens of Chicago would have gotten the iconic Chicago Spire thus bringing even more world-wide acclaim to their great city.

242.    Shelbourne would have recouped its $225 Million of cash, its $300 Million of equity and earned a minimum $685 Million in profit for a total of $1.21 Billion.

243.    On March 16, 2013, only a few weeks after JLL, as NAMA's purported agent, had in violation of the September 2011 Interim Support Agreement begun marketing the Spire Loans, Kelleher advised David Bennett ("Bennett") and Malbasha of NAMA at a meeting in Dublin that Shelbourne had made arrangements for Bridgehouse Capital Ltd. ("Bridgehouse") to fund the redemption of Shelbourne's Loans that were secured by, among other things, a mortgage on the Chicago Spire site.

244.     Shelbourne's ability to redeem its Notes (at par) was confirmed that same day both orally and in a letter of the same date by its Chicago counsel, Thomas J. Murphy, to NAMA's Chicago counsel, Leonard S. Shiffler of Quarles & Brady.

245.     A copy of Mr Murphy's letter is attached as PX-15.

246.     Shelbourne, Bridgehouse's principal, Andrew Ruhan, and his team of professional advisors, then sought access to the Data Room to complete customary due diligence incident to a transaction of this nature.

247.     Access to the Data Room was the lynchpin to completion of the process of paying off in full, together will all accrued interest (including penalty interest), the indebtedness that NAMA was claiming was related to the Spire Project for a host of reasons.

248.     It was unclear both as questions of fact and law what "loans" NAMA was purporting to offer for sale as related to the Spire Project, i.e. what loans needed to be repaid in order to regain title to the dirt.

249.     The last of five notes in the approximate amount of $6 Million, whose proceeds were unquestionably used to further the Spire Project – indeed the loan's proceeds were disbursed by Anglo directly to Shelbourne creditors – was not the legal obligation of Shelbourne, but rather was that of Milltown and was not secured by any mortgage.

250.     Thus it was unclear whether this unquestionably Spire related $6 Million loan was part of what NAMA was claiming to own and then offer for sale.

251.     Neither Shelbourne, nor Bridgehouse, could determine if this $6 Million Note was among the "loans" being offered for sale by NAMA and the only way Shelbourne/Bridgehouse could determine that was by access to the Data Room since NAMA refused to meet with them or otherwise provide reliable information.

252.     As Shelbourne claimed at the time, and subsequent highly public civil litigation has confirmed, Anglo engaged for years in a pattern of interest overcharging.

253.     Indeed, present members of NAMA's Board know this from their time at Anglo.

254.     There was an obvious need for access to the Anglo interest calculation documents that were resident in the Data Room and nowhere else.

255.     Shelbourne could not get timely, straight or consistent answers from NAMA as to the amount of money it claimed Shelbourne owed.

256.     In one spread sheet provided by NAMA in answer to this inquiry, there are there several different "pay-off" amounts, all of them wrong.

257.     No competent counsel engaged by Bridgehouse would ever permit it to make a $90+/- Million investment, whose purpose was to fund the redemption of certain loans, without conducting due diligence of the lender whose indebtedness the Bridgehouse's investment was intended to satisfy.

258.     Indeed, in a "Take Out" loan transaction, no competent Chicago lawyer would permit his/her client, the take out lender, to pay over some $90 Million without an opinion from counsel for the bank receiving the money that that bank no longer had any claim against its former borrower upon receipt of the $90 Million.

259.     NAMA knew that to be true and to be the custom and practice in Chicago.

260.     Thus complying with this practice fell within NAMA's duty of reasonableness imposed upon it by the NAMA Act.

261.     NAMA denied Bridgehouse access to the Data Room being maintained by JLL and otherwise refused to engage with Bridgehouse's or Shelbourne's counsel regarding

Bridgehouse's funding of the redemption of the "Loans," whatever loans may have been at issue,

because Bridgehouse would not sign the standard NDA.

262.    This was confirmed in writing in an e-mail from Kelleher to Bennett, Malbasha

and Moriarty ("Moriarty") of NAMA dated June 5, 2013 that states in pertinent part:

> David,
>
> The below is my recollection of our meeting with Andy Ruhan and subsequent communications:
>
> A. You would consider whether he could access the data room via your lawyers – i.e. circumventing the JLL process.  This was subsequently denied by NAMA as you indicated that that would prejudice NAMA with others OR
>
> B. He could sign up – at the then late stage – to the terms of NDA or CA that JLL has issued.  **Given that he was introduced by me and that the basis of him being prepared to redeem the loans was that he had my cooperation before, during and subsequently this was completely <u>impossible</u>.**
>
> * * *
>
> Andy Ruhan's view is that he will wait until the current sales process is complete and then look to deal with the purchaser.  He expressed to Shelbourne in the meeting that from his perspective it made no sense for NAMA to be selling the loans, whilst in the middle of litigation and excluding me and my associates from the process.  Also, as I am sure you are aware my lawyer in Chicago, Tom Murphy, has written to NAMA's lawyer indicating that Andy Ruhan **wishes to fund my redemption of the Spire loans.**

(Emphasis added.)

263.    Kelleher's e-mail received the following nonsensical response from Bennett of

NAMA:

> For the avoidance of doubt we should clarify one point Shelbourne raise below:
>
> Mr Ruhan's request for access to the JLL data room [sic] was never declined by NAMA – quite to the contrary, Mr Ruhan was encouraged to engage with JLL but instead choose not to sign up to the terms and conditions associated with the sale and under which other interested parties had previously signed up to.

264.    A copy of this e-mail exchange is attached hereto as PX-16.

265.     In round numbers, the Shelbourne offer (funded by Bridgehouse) to redeem the Notes would have netted NAMA – which was falsely claiming to own the Loans -- approximately $92.5 Million and would have represented a 100% recovery of principal and accrued interest (including penalty interest).

**NAMA's Attempted Fraud Regarding the April 24 Meeting**

266.     In discovery in litigation in Ireland brought by NALM against Kelleher based upon his guarantees of the obligations of other "Shelbourne Connection" entities that was commenced based upon his alleged failure to honour his duty to cooperate with NAMA pursuant to the September 2011 Interim Support Agreement to which NALM was not a party, Shelbourne has obtained copies of three NAMA internal documents relating to the foregoing that show the continuing dishonesty or fraud of NAMA.

267.     PX-17 are the handwritten notes of Malbasha, who was one of the two NAMA officials who attended the April 24 Meeting at which "redemption" of Shelbourne's Loans was discussed.

268.     Literally the very first substantive word in Malbasha's notes is **"Redemption."**

269.     Also noteworthy is the fact that his notes state:  "issue with IBRC loans in States – overcharging."

270.     Malbasha's notes also confirm that Bridgehouse needed one week to "review info in data room" and then three weeks for the assessment of creditors and to purchase the loans obviously at par value since the first word of his notes is "Redemption."

271.     PX-18 is an e-mail exchange between the two NAMA participants in the April 24 Meeting, Messrs Bennett and Malbasha.

272.     Bennett was the senior of the two.

43

273.    They begin with an email from Bennett to Malbasha sent on May 22, 2013 asking Malbasha if he had ever completed the "Minutes" of the April 24 Meeting with Messrs Ruhan and Kelleher because "Obviously important to have something on file for this."

274.    May 22, 2013 was the day after the IBRC Spire Loans were transferred to NALM in conformity with Section 91 of the NAMA Act of 2009, As Amended.  *See* PX-6 through PX-8.

275.    Prior to May 21, 2013 neither NAMA nor NALM had complied with the requirements of Section 91 of the NAMA Act in respect of the Spire Loans and, therefore, by operation of Irish law could have had no beneficial or legal interest in the Spire Loans.

276.    Then a week later Bennett sent Malbasha another e-mail in the chain stating "Not sure you came back to me on this."

277.    Knowing how events actually unfolded and knowing he could no longer hide from Bennett's demands, Malbasha chose to "re-write history."

278.    He prepared type-written "Minutes" of the April 24 Meeting that vary materially from his handwritten notes.

279.    These Minutes are attached as PX-19.

280.    Nowhere in the typed Minutes appears the word "Redemption," which is the first substantive word in Malbasha's handwritten notes of the meeting.

281.    Instead the typed Minutes state the Mr Ruhan said he did not "bid" for the Spire Loans "as he felt he could not comply with the terms of the NDA."

282.    The substantive difference between "bidding" for a loan and "redeeming" a loan is as big a difference as that between day and night.

44

283.     One can "bid" any amount for a loan being offered for sale recognizing that the owner of the loan has no obligation to accept the "bid."

284.     One can "redeem" a loan for only one amount, that amount being the total amount due including interest and any other proper charges, and the holder of the note must accept payment in full.

285.     Malbasha's wilful and wanton disregard for the truth is further reflected in last e-mail in the exchange that is part of PX-18, that transmits PX-19 (the typed Minutes) to Bennett with the comment "Feel free to amend."

286.     The typed Minutes of the April 24 Meeting further corroborate NAMA's continuing deceit as to its ownership of the Shelbourne Loans.  They state:

> AR [Andrew Ruhan] said that he really wanted to know about the status of the loan process.  We explained that we were waiting for the first round bids and that no decision had been made by NAMA at this time.

287.     Of course we now know that as of April 24, 2013 the decision was that of IBRC. It is noteworthy that Bennett felt the need for there to be "something on file" literally the day after IBRC transferred the Shelbourne Loans – not to NAMA – but rather to NALM.

**Malbasha's and NAMA's Adjudicated "Misleading" the Irish High Court**

288.     Indeed, Malbasha's "misleading" testimony is an adjudicated fact as is NAMA's.

289.     In another case involving a "Shelbourne Connection" company, Middleview Limited, Irish High Court Judge Brian Cregan found Malbasha's testimony "positively misleading the court" on no less than seven different occasions.  A copy of that decision is attached hereto as PX-20.

290.     By the time of this December 2015 decision, NAMA's former employees and non-executive directors were under investigation by criminal, civil and legislative bodies in

Ireland and the United Kingdom, as well as the United States Securities and Exchange Commission.

291. NAMA had been widely charged with "giving away" most of the properties that NAMA had taken over to investment funds for a fraction of their value by bulk sales of loans that only a handful of investors around the world could purchase.

292. This was far removed from the task assigned to NAMA in 2009, which was to address the problem essentially borrower by borrower.

293. Without a doubt, out of spite NAMA had caused the Spire Loans to be sold for approximately 1/3 of what Shelbourne was ready, willing and able to pay in flagrant and shameful disregard of its duties to the Irish tax payers.

294. Claiming "reputational damage" to Malbasha, NAMA made an application to Judge Cregan to review and revise his judgment in respect of his findings regarding Malbasha misleading the Court.

295. On January 29, 2016, Judge Cregan rendered a thoughtful and detailed decision reaffirming his earlier conclusion that stated paragraphs of a Malbasha affidavit and an affidavit submitted by Margaret Magee also of NAMA "all combined to leave the court with a misleading impression of what happened." A copy of that Decision is attached as PX-21.

296. Rather be grateful for Judge Cregan's acceptance of Malbasha's representation that he did not intend to mislead the Court, NAMA once again vouched for Malbasha's indefensible conduct and appealed Judge Cregan's ruling.

297. This was a desperate move by a desperate litigant that was feeling the walls close in on all sides.

298.   As any objective person would have expected, Judge Cregan's rulings regarding Malbasha's and Magee's misleading affidavits – subsequently vouched for and reaffirmed by NAMA by reason of its appeal – were upheld.

299.   A copy of that opinion is attached hereto as PX-22.

**The Appointment of "Special Liquidators" for IBRC on February 7, 2013; Blatant Inconsistencies Between Statements in Their Chapter 15 Petition and NAMA's Conduct; and NAMA's Conduct Indicating Malice Toward Shelbourne/Kelleher**

300.   As noted above, the Spire debt represented about 15% of Kelleher's issues with NAMA.  While Shelbourne was and is a discrete juridical entity, whose purported obligations both to and from NAMA are discrete and there existed no cross-collateralization between Shelbourne and any other entity in which Kelleher had a direct or indirect interest (other than Kelleher's personal guarantee, which was discharged by Kelleher's performance of his obligations under the September 2011 Interim Support Agreement), NAMA never looked at things that way.

301.   Hence the NAMA term the "Shelbourne Connection" meaning "everything Kelleher owed regardless of legal nicety."

302.   In unrelated proceedings in Ireland Kelleher defended various rights successfully.

303.   Although initially Kelleher did all that he could do to honour obligations originally due Anglo (including moving back to Ireland to do so), for long and complicated reasons by mid-2013 there was very "bad blood" between NAMA and Kelleher.

304.   Indeed, by 2013 there was bad blood between NAMA and many other Irish real estate developers.

305.   On February 7, 2013, as the Ruhan/Bridgehouse opportunity was coming on the scene and while the Loans still were an asset of IBRC, the Irish Minister for Finance appointed

47

Kieran Wallace and Eamonn Richardson Special Liquidators of IBRC (the "Special Liquidators").

306.    Both men are partners in the Dublin office of the international public accounting firm of KPMG.

307.    On August 28, 2013, the Special Liquidators filed a Chapter 15 Petition for Recognition of a Foreign Proceeding in the United States Bankruptcy Court for the District of Delaware.  (Case No. 13-12159).

308.    A copy of their Chapter 15 Petition is attached hereto as PX-23.

309.    The Petition contains a host of admissions by IBRC as to events and their dates, which are also binding on NAMA as admissions.

310.    Upon their appointment, the Special Liquidators should have been substituted as the real party in interest in the Foreclosure Proceeding in Chicago, which certainly would have placed Shelbourne on notice that its loans had not in fact been transferred in November 2010 as part of Tranche 3.

311.    Paragraphs 20 through 22 of the IBRC Chapter 15 Petition state:

20. Following their appointment, the Special Liquidators were tasked with conducting an orderly winding up of IBRC in accordance with the Bank Resolution Act, the Ministerial Instructions issued on February 7, 2013, May 10, 2013 and July 20, 2013 by the Finance Minister pursuant to section 9 of the Bank Resolution Act (the "Ministerial Instructions") and applicable Irish law. Shortly after the commencement of the Irish Proceeding, the Special Liquidators sent a letter to all of IBRC's known creditors notifying them of the issuance of the Special Liquidation Order and prescribing the manner by which they should file claims against IBRC. The Special Liquidators are obliged to continue to keep all creditors informed of the progress of the Irish Proceeding as required under the European Communities (Reorganization and Winding Up of Credit Institutions) Regulations, 2011.

21. As part of the Irish Proceeding, the Special Liquidators are responsible for overseeing the sales and valuation process in respect of IBRC's loan book. Specifically, the Special Liquidators have been directed to appoint independent

appraisers to complete a valuation of IBRC's assets and liabilities. Subsequently, all assets will be offered for sale to the highest bidder whose bid equals or exceeds the value as determined by the independent appraisers (the **"Valued Price").** If bids received do not at least match the Valued Price, the assets will be sold to NAMA at the Valued Price.

22. Since their appointment, the Special Liquidators have taken significant steps towards preparing for the sale of IBRC's assets, including its loan book. In this regard, the Special Liquidators have engaged the services of independent professional appraisers for the purpose of valuing IBRC's loan book and assets. The Special Liquidators have also engaged, among others, legal and property advisors to conduct due diligence of IBRC's loan book and collateral securing the loans. **The Special Liquidators are currently in the process of developing a framework strategy for the marketing and sale of IBRC's assets.**

(Emphasis added.)

### Subsequent Sale of the Notes With Kelleher's Guarantees Still Attached to RMW Acquisition

312.   Shortly after NALM -- not NAMA -- acquired the Notes on May 21, 2013 it then sold them to RMW Acquisition Company ("RMW") for, upon information and belief, approximately $35 Million in or about July 2013, with Kelleher's personal guarantees still attached to the Loans.

313.   There is nothing about the character of the Special Liquidators or their conduct of the liquidation of IBRC to date that would support any allegation that they knowingly cheated the creditors of IBRC out of $57 Million at the time they sold the Notes for roughly a third of the price that Shelbourne had been ready, willing and able to pay.

314.   Upon information and belief, neither NAMA nor NALM ever informed them of Shelbourne's far superior offer.

## AS AND FOR A FIRST CLAIM
### (Breach of Contract)

315.    Shelbourne restates and realleges its allegations from Paragraphs 1-314 herein as Paragraph 315 of Count I.

316.    By facilitating the sale of the Shelbourne Loans rather that causing IBRC to proceed with the foreclosure so that the Spire Site could be sold free and clear of all liens, thus allowing Shelbourne to bid at the foreclosure auction, NAMA breached the September 2011 Interim Support Agreement because it had the power to cause IBRC to honour the Agreement, or, alternatively, at least to negotiate in good faith with Shelbourne regarding the resolution of its indebtedness to IBRC on terms that would have resulted in IBRC receiving tens of millions of dollars more than it ultimately received as the consequence of NAMA's deceitful conduct as described above.

317.    Upon information and belief, NAMA affirmatively failed to disclose to the Special Liquidators Shelbourne's communications to it regarding the fact that it was ready, willing and able to redeem its Loans at par.

318.    After the Loans were sold to RMW, RMW commenced litigation against Kelleher based upon his personal guarantees that should have been released pursuant to the terms of the September 2011 Interim Support Agreement.

319.    Kelleher has claims for indemnification against Shelbourne for his costs of defending that litigation that was ultimately dismissed because RMW would not produce the Loan transfer documents.

320.    As a consequence of NAMA's breach of the September 2011 Interim Support Agreement, Shelbourne suffered money damages in a sum to be proven at trial that are estimated to be approximately $1.21 Billion.

## AS AND FOR A SECOND CLAIM
### (Tortious Interference With Contract)

321.     Shelbourne restates and realleges its allegations from Paragraphs 1-320 herein as Paragraph 321 of Count II.

322.     Upon information and belief based upon PX-10 and PX-11, sometime after their appointment and before March 13, 2013, the Special Liquidators and NAMA/NALM entered into an agreement whereby NAMA/NALM became the agent of the Special Liquidators in respect of the collection of the Spire Loans.

323.     Pursuant to that agreement the Special Liquidators assented to NAMA/NALM's acting on their behalf and subject to their control as their agent in dealing with others in respect to the Spire Notes including expressly Shelbourne and Kelleher.

324.     Paragraph 3 of the Shelbourne's Note secured by a mortgage on the Spire site states in pertinent part:

> The Borrower may prepay the outstanding Principal Sum, in whole at any time … provided, however, that: (i) Borrower gives the Lender at least seven (7) Business Days prior written notice … and (ii) each prepayment is accompanied by payment of accrued interest ….  In the event the outstanding Principal Sum is prepaid prior to the Maturity Date, **whether by reason of the acceleration of the maturity of this Note** or otherwise, the "Breakage Cost" set forth below shall also be due and payable. ….

(Emphasis added.)

325.     In addition, 735 ILCS 5-15-1605 states that a defaulting mortgagee can redeem its property up to the time of a foreclosure sale.

326.     At the time of the April 24 Meeting discussed above, bids had not yet even been solicited, much less a bid accepted.

327.     Shelbourne thus had a contractual right to redeem its Loans.

328.     NAMA/NALM knew of this contractual right and that it was enforceable.

51

329.    In addition, unlike NAMA/NALM, IBRC and its Special Liquidators suffered no statutory disability that prevented it from accepting from Shelbourne a sum of money vastly larger than the sum of money it ultimately received for the Spire Loans from NALM, but significantly less that the full amount due.

330.    Accordingly, Shelbourne also had a contractual right to make an offer of compromise to IBRC and its Special Liquidators to resolve its indebtedness represented by the Spire Notes for a sum of money far less than the total amount owed, while still far larger than the sum that IBRC ultimately received.

331.    NAMA/NALM knew of Shelbourne's right to make an offer of compromise to the Special Liquidators and that it was enforceable.

332.    NAMA/NALM, as agent, never disclosed to its principal, the Special Liquidators, (a) Mr. Murphy's March 16, 2013 letter confirming Shelbourne's desire to redeem the Spire Loans (PX-15); (b) the substance of what occurred at the April 24 Meeting among Messrs Ruhan, Kelleher, Bennett and Malbasha; (c) the e-mail exchange following NAMA's denial of access to the Data Room to Bridgehouse and its advisors (PX-17); the substance of that e-mail exchange; or (d) the substance of Malbasha's handwritten notes of the April 24 Meeting (PX-16).

333.    A reasonable person serving as an agent to the Special Liquidators would have advised them of all of the information to which reference is made in the foregoing paragraph and that Shelbourne was ready, willing and able to redeem its Loans subject to Bridgehouse conducting ordinary and customary due diligence by having access to the Data Room to determine, among other things, what Loans were necessary to be redeemed in order to acquire all

52

rights to the Spire Site and what amount was truly owed given the legitimate questions about Anglo's practice of interest overcharging.

334. A reasonable person serving as an agent to the Special Liquidators would have advised them that Shelbourne was ready, willing and able to make an offer to purchase its Loans at a price significantly higher than the price the Liquidators ultimately received for the Loans.

335. Upon information and belief, the Special Liquidators were never advised that Bridgehouse had sought access to the Data Room for the sole and express purpose of conducting due diligence in contemplation of funding the redemption of the Chicago Spire Loans.

336. NAMA/NALM, as agent to the Special Liquidators, had a duty to advise them of Bridgehouse's aforesaid request and the specific purpose underlying the request.

337. In addition, as agent to the Special Liquidators, NAMA/NALM had a duty to advise them in April 2013 that Shelbourne was ready, willing and able to negotiate the purchase of the Chicago Spire Loans at a price more than double the price at which NAMA was predicting the Special Liquidators would receive.

338. Upon information and belief, NAMA/NALM wilfully, without justification or excuse and motivated purely by malice directed toward Kelleher breached their duties owed to the Special Liquidators.

339. The failures of NAMA/NALM, as the Special Liquidators' agents, to advise the Special Liquidators of Shelbourne's demand to redeem its Loans at par or to purchase them at a price vastly higher than the price that the Special Liquidators ultimately obtained made no sense, legal or otherwise.

340. NAMA/NALM could have had no motive or explanation for their irrational actions that prevented redemption of Shelbourne's Loans and prevented the Special Liquidators

from recovering much more for the Spire Loans than they ultimately recovered other than malice toward Shelbourne and its principal Kelleher.

341.    NAMA/NALM could have had no other conceivable motive to impose as much as a $57 Million burden on the already overburdened Irish taxpayers; deprive the creditors of IBRC of as much as $57 Million; and also deprive the citizens of Chicago of a real estate project that would have brought the City world-wide acclaim.

342.    So pure malice toward Shelbourne and Kelleher can be the only explanation for NAMA/NALM's conduct.

343.    NAMA/NALM intentionally, without justification and with extreme and irrational malice caused the breach of Shelbourne's contracts with IBRC/the Special Liquidators by (a) deceitfully representing to Shelbourne in particular and to the public in general that it was the owner of the Spire Loans and (b) deceitfully failing to disclose to the Special Liquidators that Shelbourne was ready, willing and able to redeem its Loans or otherwise purchase them at a price vastly higher than the Special Liquidators ultimately received.

344.    Had NAMA/NALM not breached its fiduciary duties to the Special Liquidators and therefore had the Special Liquidators known in April 2013 that they could receive at least twice the amount that they ultimately received in satisfaction of the Spire Loans they gladly would have accepted that sum.

345.    Indeed, the Special Liquidators had a fiduciary duty to the creditors of IBRC to accept the higher amount from Shelbourne.

346.    Now that the Special Liquidators are on actual notice by reason of the filing of this action of NAMA/NALM's deceitful and malicious conduct and its wilful and wanton breach of their duties to the Special Liquidators as their agent, they have a fiduciary duty to bring suit

54

against NAMA/NALM to recover for the benefit of IBRC's creditors the damages that NAMA/NALM's deceit caused, namely the difference between what IBRC actually recovered for the Spire Loans as compared to what it could have recovered from Shelbourne.

347. NAMA/NALM's aforesaid tortious interference with its contract with IBRC and its Special Liquidators also caused damages to Shelbourne resulting in its loss of the Spire Site and ultimately its ability (to date) to complete construction of the Chicago Spire.

348. These damages are estimated to be approximately $1.21 Billion.

**AS AND FOR A THIRD CLAIM**
**(Tortious Interference With Prospective Economic Advantage)**

349. Shelbourne restates and realleges its allegations from Paragraphs 1-348 herein as Paragraph 349 of Count III.

350. Shelbourne had a reasonable expectancy it would enter into a valid business relationship with Bridgehouse whereby Bridgehouse would fund paying off its Loans in full and then develop the Chicago Spire with it.

351. By no later than April 24, 2013, NAMA knew of this expectancy.

352. NAMA's above described malicious and intentional interference with this expectancy prevented it from ripening into a valid business relationship.

353. Upon information and belief, NALM may have played some role in the tortious conduct that appeared at the time to have been conducted by entirely by NAMA.

354. Thus to whatever extent NALM bears some responsibility for the damages that appear to have been caused solely by NAMA, recovery is also sought against NALM.

355. As a consequence of the tortious interference with its prospective economic advantage, Shelbourne suffered damages that are estimated to be approximately $1.21 Billion.

55

### AS AND FOR A FOURTH CLAIM
**(Breach of Statutory and Common Law Duties to Preserve Confidential Information)**

356.    Shelbourne restates and realleges its allegations from Paragraphs 1-355 herein as Paragraph 356 of Count IV.

357.    A former employee of NAMA, Enda Farrell, was charged with and pleaded guilty to eight counts of unlawfully disclosing information in violation of the 2009 NAMA Act.

358.    He was received a two year suspended sentence from the Irish Criminal Court.

359.    Originally, NAMA vigorously denied that any of Farrell's "leaks" related to the Spire.

360.    On November 7, 2016, NAMA admitted that among the confidential information that its employee Enda Farrell had leaked was confidential information relating to the Spire notwithstanding prior strenuous denials to the contrary by Moriarty of NAMA.

361.    This Moriarty admission followed a story published in the *Irish Times* on September 11, 2016 that Farrell had informed the Irish authorities that Farrell "provided a major US property fund with a confidential valuation report on a significant US asset, which was then under Nama's control."

362.    Upon information and belief, that "major US property fund" was Apollo Real Estate Advisors ("AREA") and the "significant US asset" was the Chicago Spire.

363.    The individual who received the data was its CEO Lee Neibart, someone well known to Mulcahy from his JLL and NPRF days.

364.    At the time Shelbourne had already entered into a NDA with AREA regarding funding the redemption of its Loans and then developing the Spire Project and was in the process of negotiations.

365.    Those negotiations were terminated precipitously by AREA.

56

366.    Upon information and belief, AREA terminated those negotiations based upon false information "leaked" by Farrell.

367.    Upon information and belief, Shelbourne was unsuccessful in finding other investors based upon false information "leaked" by Farrell.

368.    But other than admitting that the information was "confidential," NAMA has refused to provide Shelbourne with a copy of what was "leaked" claiming it to still be confidential.

369.    NAMA had statutory and common law duties to take reasonable care to preserve Shelbourne's confidences.

370.    The criminal conviction of Edna Farrell in Ireland constitutes *res judicata* that NAMA violated its statutory duty under the NAMA Act.

371.    NAMA was grossly negligent in preserving Shelbourne's confidences.

372.    As a result of its breaches of these duties, Shelbourne suffered damages in an amount to be proven at trial, but in no event less than $75,000, exclusive of interest and costs.

### AS AND FOR A FIFTH CLAIM
### (Negligent Spoilation of Evidence)

373.    Shelbourne restates and realleges its allegations from Paragraphs 1-372 herein as Paragraph 373 of Count V.

374.    By March 12, 2015, NAMA and certain companies that NAMA had dubbed in 2010 as being within the "Shelbourne Connection" and Kelleher were already involved in litigation with one another.

375.    The threat of litigation between Shelbourne and NAMA was plainly obvious to any reasonable person by that date.

57

376.     Nonetheless on that date NAMA issued a Memorandum adopting a policy calling for the destruction of all e-mails and other written communication of former employees.

377.     A copy of that Memorandum is attached hereto as PX-24.

378.     Upon information and belief pursuant to PX-24 copies of highly relevant probative documents relevant to this action have been destroyed.

379.     A reasonable person in NAMA's place would have perceived that the destroyed evidence would be material to this potential action.

380.     Thus NAMA had a duty to preserve this evidence.

381.     By destroying this evidence NAMA breached that duty.

382.     As a consequence of the destruction of this evidence Shelbourne has been damaged because it has become more difficult to prove some or all of the claims asserted herein.

WHEREFORE Shelbourne demands judgment against NAMA and NALM as follows:

1.    On its First Claim for money damages in an amount to be proven at trial that are estimated to be not less than $1.21 Billion, exclusive of interest and costs.

2.    On its Second Claim for money damages in an amount to be proven at trial that are estimated to be not less than $1.21 Billion, exclusive of interest and costs.

3.    On its Third Claim for money damages in an amount to be proven at trial that are estimated to be not less than $1.21 Billion, exclusive of interest and costs.

4.    On its Fourth Claim for money damages in an amount to be proven at trial that are estimated to be not less than $75,000 exclusive of interest and costs.

5.    On its Fifth Claim for money damages in an amount to be proven at trial that are estimated to be not less than $75,000, exclusive of interest and costs.

6. Awarding it the costs of this action, together with such other, further or different

relief as to this Court may seem just and proper.

Dated:  Chicago, Illinois
        February 27, 2018

                                    BARCLAY DAMON LLP


                                    By: /s/ J. Joseph Bainton


                                    J. JOSEPH BAINTON
                                    KATHERINE B. FELICE
                                    1270 Avenue of the Americas
                                    New York, NY 10020
                                    Telephone: 212-784-5811
                                    e-mail: jbainton@barclaydamon.com
                                            kfelice@barclaydamon.com

                                    -- and –

                                    FREEBORN & PETERS, LLP
                                    Michael J. Kelly
                                    Adam C. Toosley
                                    311 South Wacker Drive, Suite 300
                                    Chicago, IL 60606
                                    Telephone:  312-360-6789
                                    e-mail: mkelly@freeborn.com
                                            atoosley@freeborn.com

14838738.1

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746 I hereby affirm and verify that I have read the foregoing

Verified Complaint and know the allegations contained therein to be true of my own personal

knowledge except those matters alleged upon information and belief and those allegations I

believe in all good faith to be true.

Dated: Dublin, Ireland
   February 26, 2018

<u>             </u>
      Garrett Kelleher

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury

of all issues triable of right by jury.

**NOTICE OF RELIANCE ON FOREIGN LAW**

Pursuant to Federal Rule of Civil Procedure 44.1, Plaintiff hereby gives notice that it

relies on foreign law, namely the NAMA Act of 2009, as amended as of the date of the filing of

this action, of the Republic of Ireland and Section 1605(a) of the Treaty of Friendship,

Commerce and Navigation between the United States and Ireland, 1 U.S.T. 788.

14838738.1