# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| SHELBOURNE NORTH WATER STREET CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | No. 18-cv-01461 |
| v. | ) ) | Judge Andrea R. Wood |
| NATIONAL ASSET MANAGEMENT AGENCY, et al., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In July 2006, Plaintiff Shelbourne North Water Street Corporation ("Shelbourne") set out to construct a towering residential skyscraper—informally called the Chicago Spire—that was intended to be an iconic part of the Chicago skyline. Its grand plans were derailed when the world's financial markets crashed in 2008 and Shelbourne could no longer obtain funding for the project. Meanwhile, the Irish bank that had previously provided Shelbourne funding was facing insolvency. Ireland created Defendants National Asset Management Agency ("NAMA") and National Asset Loan Management ("NALM," and together with NAMA, "Defendants") by statute for the purpose of taking defaulted real estate assets off the books of such failing Irish banks. Among the assets Defendants acquired were the loans that had funded the Chicago Spire. Eventually, Defendants sold the Spire loans for millions less than par value. Shelbourne contends that, at the time of sale, it had the contractual right and the ability to buy those loans at par. Shelbourne thus has brought the present lawsuit alleging that Defendants improperly prevented it from redeeming its loans. Defendants move to dismiss this case pursuant to Federal Rules of Civil

Procedure 12(b)(1), 12(b)(2), 12(b)(3), and 12(b)(6). (Dkt. No. 24.) For the following reasons, Defendants' motion is granted.

## BACKGROUND

Shelbourne is a company associated with Garrett Kelleher, an Irish international real estate developer. (Am. Compl. ¶¶ 7–9, Dkt. No. 68.)[1] In July 2006, Shelbourne began a project to build what was commonly referred to as the Chicago Spire, which it hoped would be the tallest residential building in the world. (*Id.* ¶¶ 10, 85, 88.) The Chicago Spire would be located in downtown Chicago near the shore of Lake Michigan. (*Id.* ¶ 87.) By early 2008, the "entire design, marketing, sales, foundation and substructure of the Spire was completed at a cost of $300 million." (*Id.* ¶ 115.) Funding for the initial portion of the project came in the form of a $225 million equity investment by Shelbourne and an approximately $90 million loan from the Ireland-based Anglo Irish Bank Corporation ("Anglo"). (*Id.* ¶ 117.) The Anglo loan was personally guaranteed by Kelleher. (*Id.*)

In August 2008, due to the worldwide financial crisis, Anglo was unable to continue funding the Chicago Spire project and Shelbourne was not able to acquire an alternative funding source. (*Id.* ¶¶ 118, 122.) With Shelbourne lacking liquidity to make up for the loss of outside funding, development of the Chicago Spire "came to a grinding and painful halt." (*Id.* ¶¶ 127–29.) Around this time, in addition to the approximately $90 million owed for the Chicago Spire project, companies owned either directly or indirectly by Kelleher owed around $510 million of debt to Anglo, which Kelleher had personally guaranteed either entirely or in part. (*Id.* ¶ 131.) Kelleher's companies also owed another $600 million to other Irish banks. (*Id.* ¶ 132.) In total,

---

[1] Shelbourne is a corporation organized under the laws of Delaware with its principal place of business located within the Northern District of Illinois. (Am. Compl. ¶ 4.) It was formerly known as Shelbourne North Water Street, LP. (*Id.*) At all times relevant to this action, Shelbourne was owned entirely by Milltown, LLC, which in turn was owned entirely by Kelleher. (*Id.* ¶¶ 5–6.)

Kelleher's companies owed approximately $1.2 billion to various Irish banks related to property development projects. (*Id.* ¶¶ 46–47, 132–33.)

Beginning in the fall of 2008, Irish banks were facing the threat of insolvency as a result of the financial crisis. (*Id.* 30–31.) To rescue the banks, Ireland passed the National Asset Management Agency Act of 2009 ("NAMA Act" or "Act") on December 21, 2009. (*Id.* ¶ 49.) The central aspect of the Act was the creation of NAMA, a state-funded entity created as a "bad bank" that would acquire property-development loans from Irish banks in return for government-backed debt bonds. (*Id.* ¶¶ 50, 134) NALM is a subsidiary of NAMA, and NAMA controlled NALM in all material respects. (*Id.* ¶¶ 49, 52.)

In September 2010, a contractor who had previously filed a mechanic's lien on account of $500,000 owed to it in relation to work done on the Chicago Spire project commenced a foreclosure lawsuit in the Circuit Court of Cook County, Illinois. (*Id.* ¶ 145.) Anglo responded by filing a defensive foreclosure action to assert its interest by virtue of its first mortgage on the property. (*Id.* ¶ 151.) One month later, Anglo and NAMA advised Kelleher that the $600 million in Anglo loans that Kelleher had personally guaranteed were being transferred from Anglo to NAMA. (*Id.* ¶ 135.) From that point on, Shelbourne and Kelleher dealt with NAMA with respect to the Chicago Spire debt. (*Id.* ¶ 139.)

During this time, Shelbourne worked with NAMA to figure out a way to resume development of the Chicago Spire. (*Id.* ¶ 152.) Yet NAMA rejected numerous Shelbourne proposals, including one under which NAMA would advance $10 million to Shelbourne so it could deal with lien litigation and other matters necessary to keep the project afloat. (*Id.* ¶ 152–53.) In September 2011, NAMA and Shelbourne executed an Interim Support Agreement that required Shelbourne and Kelleher to provide NAMA with all the information necessary for

3

NAMA to prepare an appraisal of the partially-developed Chicago Spire project, which would be used in the foreclosure proceeding and to oppose the claims of mechanic's lien holders. (*Id.* ¶¶ 168–70.) A virtual data room containing confidential information relating to the Chicago Spire project was set up to aid NAMA in preparing the appraisal. (*Id.* ¶ 206.) In return for entering into the Interim Support Agreement, Kelleher would be released from all personal guarantees of the Chicago Spire loans and he would be afforded the opportunity to purchase the Chicago Spire site at a judicial auction for less than the full amount due on the loans. (*Id.* ¶ 187.)

Yet at the time NAMA executed the Interim Support Agreement, according to Shelbourne, NAMA did not even own the loans. (*Id.* ¶ 188.) Rather, the loans were transferred to NALM on May 21, 2013, and the transfer documents show that the loans were transferred from Anglo-successor Irish Bank Resolution Corporation ("IBRC"). (*Id.* ¶ 190.)[2] Under the NAMA Act, NAMA and its affiliates such as NALM were prohibited from selling any defaulted loan that they acquired to the defaulting borrower or any entity in which the defaulted borrower had any interest or affiliation. (*Id.* ¶ 197.) On the other hand, a bank such as IBRC faced no similar prohibition. (*Id.* ¶ 198.) Thus, by representing itself as the owner of the Chicago Spire loans, NAMA deprived Shelbourne of the opportunity to propose to IBRC a "Work Out" of the loans whereby Shelbourne could make an offer to pay off the loans for less than the full amount of their principal, interest, and penalty interest. (*Id.* ¶¶ 200, 202.)

Despite Shelbourne's and Kelleher's compliance with the Interim Support Agreement, NAMA ultimately publicly offered the Chicago Spire loans for sale and sold them with Kelleher's personal guarantees still attached. (*Id.* ¶¶ 205, 210.) Through a Chicago-based real estate firm, NAMA began marketing the loans on March 16, 2013, which was before the loans had been

---

[2] On July 1, 2011, by order of Ireland's finance minister, Anglo merged with Irish Nationwide Building Society to form IBRC. (*Id.* ¶¶ 26–27.)

transferred from IBRC to NALM. (*Id.* ¶¶ 204, 211, 234.) NAMA allowed potential bidders access to the virtual data room containing Shelbourne's confidential information regarding the Chicago Spire project so they could conduct due diligence. (*Id.* ¶¶ 206, 232–33.) In order to bid or even explore a bid on the loans, a potential bidder had to represent that it would not have any association, assistance, or communication with Kelleher, Shelbourne, or any of Shelbourne's affiliates. (*Id.* ¶ 233.)

Meanwhile, Shelbourne found an investor who was willing to advance approximately $92 million to fund the redemption of the Chicago Spire loans at par, which would allow Shelbourne to regain control of the site and finish construction. (*Id.* ¶ 237.) Irish taxpayers would not have lost money at all from the transactions, while Shelbourne would have gained $1.21 billion, representing $225 million of cash, $300 million of equity, and $685 million in profit. (*Id.* ¶¶ 239, 241.) To consummate the transaction, Shelbourne and its investor needed access to the data room. (*Id.* ¶¶ 245–46.) Yet they were both denied access because NAMA made access conditional on signing a non-disclosure agreement, which the investor refused to do. (*Id.* ¶ 260.) Moreover, IBRC[3] was never informed of Shelbourne's offer to purchase the Chicago Spire loans at par. (*Id.* ¶ 313.)

In July 2013, the Chicago Spire loans, which had just months before been transferred from IBRC to NALM, were sold by NALM to RMW Acquisition Company ("RMW") for about $35 million and with Kelleher's personal guarantees still attached. (*Id.* ¶ 311.) That price was about $57 million less than what Shelbourne and its investor had been willing to pay. (*Id.* ¶ 312.) Shelbourne contends that the sale of the loans to RMW breached a provision in the Chicago Spire

---

[3] On February 7, 2013, with IBRC facing an impending bankruptcy, the Irish Minister of Finance appointed Special Liquidators to wind up IBRC's affairs. (*Id.* ¶¶ 304, 306, 310.) Thus, at the time that loans were being marketed, IBRC was being run by the Special Liquidators.

note that allowed Shelbourne to redeem the note by paying the full outstanding principal. (*Id.* ¶¶ 321, 324.) Moreover, the sale also prevented Shelbourne from entering into a business relationship with the investor who sought to provide Shelbourne with the funds necessary to pay off the loan. (*Id.* ¶ 347.) Following the sale, RMW commenced litigation against Kelleher based on his personal guarantees that were not, but should have been, released in accordance with the Interim Support Agreement. (*Id.* ¶ 316.)

Shelbourne filed the present lawsuit against Defendants seeking $1.21 billion in damages, based on the amounts it allegedly lost as a result of Defendants' conduct. The amended complaint sets forth claims for tortious interference with contract—*i.e.*, the Chicago Spire note and mortgage—and tortious interference with prospective economic advantage, both based on Defendants' actions to prevent Shelbourne from purchasing its defaulted Chicago Spire loans. The amended complaint also sets forth a claim against NAMA for breach of statutory and common law duties to preserve confidential information arising out of a criminal matter in Irish court concerning a former NAMA employee's leak of confidential information related to the Chicago Spire. (*Id.* ¶¶ 353–69.) Specifically, when Shelbourne sought to discover the nature of the leaked confidential information, NAMA refused to provide a copy or details of the leaked information in violation of its statutory and common law duties to take reasonable care to preserve Shelbourne's confidences. (*Id.* ¶¶ 365–66.) Finally, Shelbourne brings a claim of negligent spoliation of evidence against NAMA based on NAMA's adoption of a policy calling for the destruction of all e-mails and other written communications of former employees. (*Id.* ¶¶ 370–79.)[4]

---

[4] For its claims based on the breach of a duty to preserve confidential information and negligent spoliation, Shelbourne does not specify whether the claims are asserted against both Defendants or just NAMA. None of the relevant allegations mention NALM, however, so the Court interprets the claims as being asserted against only NAMA.

**DISCUSSION**

Defendants argue for dismissal under several subsections of Federal Rule of Civil Procedure 12(b). One of the cited grounds for dismissal is lack of subject-matter jurisdiction under Rule 12(b)(1). Specifically, Defendants contend that because they are foreign states, they are immune from the jurisdiction of courts in the United States under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* This Court must be secure in its subject-matter jurisdiction before evaluating any other grounds for dismissal. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514–15 (2006); *Illinois v. City of Chi.*, 137 F.3d 474, 478 (7th Cir. 1998) ("Subject-matter jurisdiction is the first question in every case, and if the court concludes that it lacks jurisdiction it must proceed no further.").

Under the FSIA, "'a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States' unless one of several statutorily defined exceptions applies." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610–11 (1992) (quoting 28 U.S.C. § 1604). Here, the parties agree that Defendants are foreign states for purposes of the FSIA and thus presumptively immune from jurisdiction. *See Shih v. Taipei Econ. & Cultural Representative Office*, 693 F. Supp. 2d 805, 809 (N.D. Ill. 2010). The issue, then, is whether one of the FSIA's enumerated exceptions to sovereign immunity applies. *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004) ("At the threshold of every action in a district court against a foreign state, the court must satisfy itself that one of the exceptions applies, as subject-matter jurisdiction in any such action depends on that application."). It is the plaintiff's burden to prove that one of the exceptions applies. *See Enahoro v. Abubakar*, 408 F.3d 877, 882 (7th Cir. 2005).

## I. Waiver Exception

The first exception to sovereign immunity that Shelbourne invokes is 28 U.S.C. § 1605(a)(1), which renders a foreign state not immune when it "has waived its immunity either explicitly or by implication." The waiver provision is read narrowly, and "courts rarely find that a nation has waived its sovereign immunity . . . without strong evidence that this is what the foreign state intended." *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 377 (7th Cir. 1985). One way a foreign state may waive sovereign immunity is by agreeing "that a contract is governed by the law of a particular country." *Id.* Shelbourne contends there has been a waiver of immunity here because the terms of the National Asset Management Agency Act states that foreign law will govern foreign bank assets.

But Shelbourne reads too much into the language of the Act. The relevant provisions provide:

> (3) To the extent that a bank asset proposed to be acquired by NAMA is or includes a foreign bank asset—
>
> (a) if the law governing the transfer or assignment of the foreign bank asset permits the transfer or assignment of that asset, the participating institution shall if NAMA so directs do everything required by law to give effect to the acquisition,
>
> or
>
> (b) if the relevant foreign law does not permit the transfer or assignment of the foreign bank asset, the participating institution shall if NAMA so directs do all that the participating institution is permitted to do under that law to assign to NAMA the greatest interest possible in the foreign bank asset.

(Am. Compl. ¶ 81 (quoting Section 91 of the NAMA Act).) These provisions simply recognize that when a bank transfers a foreign bank asset to NAMA, the bank must abide by the law to which the bank agreed so as to effect a full transfer of the asset, or at least the greatest interest possible in the asset, to NAMA.

Because NAMA acquires pre-existing assets from Irish banks, it had no role in agreeing to the law governing the transfer or assignment of those assets. The Court cannot conclude that NAMA's recognition that a bank must comply with the governing foreign law in transferring foreign bank assets to NAMA amounts to a clearly expressed intent to be subject to suit in United States courts. *See Sampson v. Federal Republic of Germany*, 250 F.3d 1145, 1150 (7th Cir. 2001) ("[A]n implied waiver depends upon the foreign government's having at some point indicated its amenability to suit." (internal quotation marks omitted)). Similarly, the fact that the mortgage and note underlying the Chicago Spire debt were expressly governed by Illinois law does not amount to a waiver when NAMA had no role in agreeing to the choice-of-law provisions in those documents. There is simply no basis for the Court to find that Defendants waived sovereign immunity by contract.

## II. Commercial-Activity Exception

Shelbourne next argues that Defendants' commercial activities subject them to this Court's jurisdiction under the FSIA's commercial-activity exception to sovereign immunity. That exception provides that a foreign state is not immune where:

> the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of a foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2). Shelbourne focuses its arguments on the first option, arguing that Defendants are not immune on account of six sets of commercial activities carried on in the United States.

The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be

determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). However, the word "commercial" itself is left largely undefined. *Weltover*, 504 U.S. at 612. Nonetheless, the Supreme Court has held that "commercial" should be understood by reference to the "restrictive" theory of sovereign immunity, which the FSIA intended to codify. *Id.* at 612–13. Under the restrictive theory of sovereign immunity, "a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts (*jure imperii*), but not as to those that are private or commercial in character (*jure gestionis*)." *Saudi Arabia v. Nelson*, 507 U.S. 349, 359–60 (1993). And the Supreme Court has further explained that "a state engages in commercial activity . . . where it exercises 'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns.'" *Id.* at 360 (quoting *Weltover*, 504 U.S. at 614). "Put differently, a foreign state engages in commercial activity for purposes of the restrictive theory only where it acts 'in the manner of a private player within' the market." *Id.* (quoting *Weltover*, 504 U.S. at 614).

The fact that a foreign state engaged in a commercial activity within the United States does not automatically compel the application of the commercial-activity exception. For the first prong of the FSIA's commercial-activity exception to apply, the action must be "based upon a commercial activity carried on in the United States." 28 U.S.C. § 1605(a)(2). The statute's use of the phrase "based upon" means that the commercial activity carried on in the United States must constitute "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Nelson*, 507 U.S. at 357. In other words, "those events [must] establish a legal element of the claim." *Santos v. Compagnie Nationale Air France*, 934 F.2d 890, 893 (7th Cir. 1991).

In evaluating the applicability of the commercial-activity exception, the Court must first identify "the particular conduct on which the . . . action is 'based' for purposes of the act." *Nelson*, 507 U.S. at 356. Here, the two main claims before the Court are tortious interference with contract and tortious interference with prospective economic advantage.[5] Shelbourne alleges that Defendants tortiously interfered with the Chicago Spire note by not allowing Shelbourne to redeem the entire outstanding principal on the note, not informing it that IBRC was the legal owner of the note, and not informing IBRC of Shelbourne's offer to pay off the outstanding principal. Shelbourne further alleges that it had a reasonable expectation of entering into a business relationship with the investor offering to resolve the Chicago Spire debt, and Defendants tortiously interfered with that relationship by misrepresenting NAMA as the owner of the loan, refusing the investor access to the data room, and requiring as a condition of bidding on the loans that the successful bidder have no association with Shelbourne and Kelleher.

Shelbourne identifies six sets of Defendants' commercial activities that occurred within the United States for purposes of the commercial-activity exception. Yet for two of those sets of activities, there is insufficient support showing that the activities occurred inside the United States. First, Shelbourne refers to Defendants' purported bad-faith negotiations with an entity called Point Capital. No allegations of such negotiations appear anywhere in the amended complaint, and instead are set forth in the Declaration of Theodore Williams (Dkt. No. 58).[6] Moreover, nowhere in that declaration are there any facts establishing that NAMA or NALM ever

---

[5] The Court focuses on the tortious interference claims for purposes of evaluating the applicability of the commercial activity exception because the claims for breach of duty to preserve confidential information and spoliation claims plainly involved activities occurring entirely in Ireland.

[6] For purposes of a Rule 12(b)(1) motion, the Court may consider declarations and other outside evidence when determining the existence of subject-matter jurisdiction. *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1993) ("The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject-matter jurisdiction exists." (internal quotation marks omitted)).

met with Point Capital in this country. Indeed, according to the declaration, the only face-to-face interactions between NAMA and Point Capital occurred in Dublin. Thus, the Court disregards this contact. The Court also disregards as a relevant commercial activity NAMA's purported bad-faith negotiations with the investor who sought to redeem Shelbourne's Chicago Spire note. Once again, neither the amended complaint nor the supporting Declaration of Andy Ruhan (Dkt. No. 62) contain any allegations or evidence showing that the negotiations occurred in the United States.

In addition, Shelbourne alleges that Defendants engaged in a commercial activity within the United States by financing the stabilization of the Chicago Spire project and funding Shelbourne's payroll. The amended complaint does vaguely allude to a promise by NAMA to fund Shelbourne's day-to-day operations, but then alleges that NAMA threatened to withhold the payroll of Shelbourne's staff without ever alleging that the stand-off was resolved. (*See* Am. Compl. ¶¶ 180–84.) Given the lack of clarity of these allegations, the Court disregards them as well.

That leaves just three categories of commercial activities that Defendants conducted in the United States. First, Shelbourne cites the fact that Defendants retained Chicago counsel, negotiated the Interim Support Agreement, and created the virtual data room. Yet Shelbourne expressly states that these actions were in connection with the foreclosure proceeding. Actions in connection with that proceeding provide background for, but are not elements of, Shelbourne's claim for relief. Indeed, these actions occurred almost a year and a half prior to the allegedly tortious behavior. Therefore, the present action is not based upon this commercial activity. Shelbourne next alleges that a NAMA representative's single to visit to Chicago was a sufficient commercial activity. The visit was not referenced in the amended complaint but alluded to in the

Declaration of Enda Farrell (Dkt. No. 57). However, Farrell supplied only very minimal details concerning the purpose of the visit. In particular, the declaration states that the representative asked how much it would cost to "fill the hole" and seems to suggest that the meeting occurred in late 2010. (Decl. of Farrell ¶ 6.) Those facts suggest that the meeting occurred while Shelbourne was exploring how it could resume development of the Chicago Spire, which was well before Defendants began marketing the loans and Shelbourne and Kelleher made any offer to redeem the loans. Thus, the meeting was far removed from Defendants' conduct forming the basis of this action and is insufficient to deprive Defendants of their sovereign immunity.

It is a closer call on whether Defendants' appointment of a real estate firm to assist it in the sale of the Chicago Spire loans suffices. Certainly, the sale is a necessary element of the claim; without the sale there would be no tortious interference. However, the Supreme Court has made clear that the fact that a particular commercial activity "would establish a single element of a claim is insufficient to demonstrate that the claim is 'based upon' that [activity] for purposes of § 1605(a)(2)." *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 395 (2015). Instead, "an action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit." *Id.* at 396. Here, it is not the sale itself that forms the gravamen of the tortious interference claims. Indeed, Defendants' sale would not have injured Shelbourne in a legally cognizable manner absent Shelbourne's offer. Rather, the suit arose by virtue of Defendants' misrepresentation concerning the rightful owner of the loans, its concealment of Shelbourne's offer to redeem the loans for the full amount owed to the rightful owner, and its acts in thwarting the investor from funding Shelbourne's offer to redeem the loans. The amended complaint does not allege that the real estate firm itself was involved in any of the purported interference. Thus, while the firm's

activities in facilitating the sale "led to the conduct that eventually injured" Shelbourne, *Nelson*, 507 U.S. at 358, they were not the basis for the tortious interference claims.

Although Shelbourne does not make any argument on the other two prongs of the commercial-activity exception, the Court has "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh*, 546 U.S. at 514. Thus, the Court will proceed to determine whether the other prongs of the commercial-activity exception are applicable here. The Court cannot identify from the amended complaint any acts performed in the United States in connection with a commercial activity elsewhere that gave rise to the claim, so the second prong does not apply. There is, however, a conceivable argument that the third prong applies, as the tortious acts occurring in Ireland in connection with the loan sale may have had a direct effect in the United States.

The primary effect in the United States of Defendants' commercial activities in Ireland was that they caused injury to Shelbourne, a United States corporation. However, financial injury to an American corporation, standing alone, is not sufficient to establish a direct effect in the United States. *See, e.g.*, *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 581–82 (7th Cir. 1989) ("The fact that an American corporation or individual has suffered financial injury due to the foreign state's actions may not be sufficient to establish FISA jurisdiction unless the foreign state has performed some 'legally significant act' here."); *Haven v. Rzeczpospolita Polska*, 68 F. Supp. 2d 947, 955 (N.D. Ill. 1999) ("[S]everal Courts of Appeals' opinions have held or indicated that financial injury suffered in the United States is insufficient of itself to meet the direct effect requirement."). In any case, the alleged financial injury is too attenuated from the tortious behavior. For the direct effect requirement to be met, the effect must "follow[] as an immediate consequence of the defendant's activity." *Weltover*, 504 U.S. at 618.

The alleged $1.21 billion injury Shelbourne suffered as a result of Defendants' conduct was based on Shelbourne's prediction that, had it been able to buy the loans, it would have completed construction of the Chicago Spire. (*See* Am. Compl. ¶¶ 237–41, 344.) Of course, had Shelbourne paid off its loans, there was no guarantee that the Spire would have been completed—Shelbourne still would have had to find the funds to actually complete construction of the Spire. Because the financial injury is a step removed from Defendants' commercial activities in Ireland, the third prong of the commercial activity exception is inapplicable.

Having failed to satisfy the requirements of any prong of the commercial-activity exception, Defendants are not subject to jurisdiction in this country on the basis of that exception.

### III. Treaty Exception

Finally, Shelbourne argues that Defendants waived sovereign immunity under the treaty exception,[7] which applies "when international agreements expressly conflict with the immunity provisions of the FSIA." *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 695 (7th Cir. 2012). Where a conflict exists, the treaty prevails and the FSIA presents no barrier to jurisdiction. *See id.* "Courts have generally required convincing evidence that a treaty was intended to waive sovereign immunity before holding that a foreign state may be sued in this country." *Frolova*, 761 F.2d at 378. Shelbourne contends that Ireland waived the immunity of its statutory bodies— including NAMA and NALM—by entering into the Treaty of Friendship, Commerce and Navigation, September 14, 1950, United States-Ireland ("Friendship Treaty"). That treaty provides, in part:

---

[7] In instances where the relevant treaty existed prior to the passage of the FSIA, the case law is not entirely clear whether the treaty exception is rooted in the portion of 28 U.S.C. § 1604 that makes sovereign immunity "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act," or in the exception enumerated in 28 U.S.C. § 1605(a)(1), or both.

> No enterprise of either Party which is publicly owned or controlled shall, if it engages in commercial, manufacturing, processing, shipping or other business activities within the territories of the other Party, claim or enjoy, either for itself or its property, immunity therein from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject therein.

1 U.S.T. 785, art. XV(3).

As an initial matter, Defendants' contention that they are not an "enterprise" for purposes of the Friendship Treaty is baseless. As alleged, Defendants operated as a "bad bank" that bought defaulting real estate assets from failing Irish banks and sold them in their best effort to realize the greatest value possible. That is sufficient to constitute an enterprise. Nonetheless, the Friendship Treaty "does not waive the right of *every* agency or instrumentality of the Republic of Ireland to raise the sovereign immunity defense before the United States courts." *Gibbons v. Udaras na Gaeltachta*, 549 F. Supp. 1094, 1107 n.4 (S.D.N.Y. 1982). Instead, it only waives sovereign immunity where the agency or instrumentality in question has "(1) engaged in commercial, manufacturing, processing, shipping or other business activities, and (2) perform[ed] these activities within the United States." *Id.*

Because Shelbourne defers to the FSIA's definition of "commercial activity" in interpreting the similar language used in the Friendship Treaty (Opp'n at 11, Dkt. No. 70), and cites the same six (narrowed above to three) commercial activities, the Court could conclude that the treaty exception does not apply on that basis alone. However, the Court is not as confident as the parties that the waiver provision in the Friendship Treaty and the FSIA's commercial activity exception should be treated the same. The FSIA uses different language from the Friendship Treaty and provides statutory definitions expanding on the terms "commercial activity" and "commercial activity carried on in the United States by a foreign state." 28 U.S.C. § 1603(d), (e).

Nonetheless, the Court finds that three discrete transactions in assistance of the larger transaction conducted in Ireland from which the suit arises do not suffice for a waiver of immunity under the Friendship Treaty. At least one court has found, while interpreting similar language in a treaty with Iran, that the test for whether an enterprise is doing commercial or other business activities in the United States "is not transactional, but is merely a 'doing business' type of test." *Harris Corp. v. Nat'l Iranian Radio & Television*, 691 F.2d 1344, 1351 (11th Cir. 1982); *see also Berkovitz v. Islamic Republic of Iran*, 735 F.2d 329, 333 (9th Cir. 1984) ("[T]his limited waiver extends only to enterprises 'doing business' in the United States."); *cf. Liberty Mut. Fire Ins. Co. v. Reimer Express Enters., Ltd.*, 82 F. Supp. 2d 887, 889 (N.D. Ill. 2000) ("For personal jurisdiction under the 'doing business' doctrine, the nonresident corporation's contacts must be continuous, permanent, ongoing and systematic not occasional or casual." (internal quotation marks and alteration omitted)). Indeed, these waiver clauses "were designed to put American companies in an equal competitive position with foreign state-owned enterprises ***expanding their operation*** into the United States—not to transform U.S. courts into international courts of claims for extra-territorial suits against these foreign enterprises." *Chi. Bridge & Iron Co. v. Islamic Republic of Iran*, 506 F. Supp. 981, 984 (N.D. Ill. 1980) (emphasis added). Moreover, the treaty's use of "activities," plural, is telling. Unlike the FSIA's commercial-activity exception, which can be based upon a single "particular commercial transaction or act," 28 U.S.C. § 1603(d), the Friendship Treaty does not appear to anticipate that sovereign immunity will be waived by an enterprise engaging in an isolated transaction within the other country or even a few. Instead, "activities" is suggestive of a requirement more akin to the enterprise having continuous and systematic business contacts with the United States.

Ultimately, because the Court finds that Ireland and the United States did not intend to waive immunity for their respective enterprises on the basis of a small number of commercial activities within the other country when the enterprise is not carrying on regular business in that country, it cannot conclude that the treaty exception applies.[8]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Dkt. No. 24) is granted. This case is dismissed for lack of subject-matter jurisdiction.

ENTERED:

Dated: March 14, 2019

Andrea R. Wood
United States District Judge

---

[8] Defendants filed concurrent with their motion to dismiss a motion to refer this case to the bankruptcy court. (Dkt. No. 23.) Having found subject-matter jurisdiction in United States courts lacking under the FSIA, that motion is denied as moot. In addition, Plaintiff filed a motion setting forth its objection that new assertions of fact contained in "Reply" Declarations submitted by NAMA are not supported by admissible evidence. (Dkt. No. 77.) Because that motion pertains to facts cited only in support of merits arguments, that motion is also denied as moot.